Simmons, C. J.
An action of trover was instituted by Harley against tbe plaintiffs in error, the purpose of which was to recover possession of twenty-five bales of sea-island cottgji to which he claimed title. He prevailed in the suit, a money verdict for $930.73 being returned in his favor. Dissatisfied with this outcome of the case, the defendants made a motion for a new trial, based on numerous grounds; but it was overruled, and they excepted. This motion presented the questions of law with which we will undertake to deal at proper length in the discussion which follows.
1. One of the contentions of the plaintiffs in error is that where cotton factors, in the usual course of business, acquire the possession of cotton from one having the custody of the same under an apparent claim of right, advance to him money thereon in ignorance of the fact that the cotton belongs to another who has sold it to him with a reservation of title until it is fully paid for, subsequently sell the cotton in order to reimburse themselves for the advances made by them, and credit the apparent owner with the proceeds of the sale, such cotton factors can not be legally held to have been guilty of a wrongful conversion, as against the true owner. In other words, it is insisted that cotton factors thus acting in entire go'od faith and to their prejudice are to be regarded' as occupying the position of an innocent purchaser without notice, entitled, as such, to protection, on the ground that they have been misled by the act of the true owner in placing it within the physical power of another to wrongfully deal with the property as his own. As a general rule, a sale <?f personalty which is delivered to the purchaser on condition that the title thereto shall not pass into him until he shall have paid the price agreed on must, “ in order for the reservation of title to be valid as against third parties,” be evidenced by a written contract, duly executed, attested, and recorded, in the same manner as are mortgages on personalty. Civil Code, §§ 2776-7. But this general rule does not apply where a planter or commission merchant makes a cash sale of cotton, although there may be a delivery of possession to the buyer on con■dition that the cotton is not to become his property until he shall have fully paid therefor. Savannah Cottony-Press Association v. MacIntyre, 92 Ga. 166. On the contrary, it is expressly provided in our Civil Code, § 3546, that cotton “sold by planters and comT mission merchants, on cash sale, shall not be considered as the *485 property of the buyer until fully paid for, although it may have been delivered to the buyer.” In view of this exception to the rule above stated, it has been uniformly held by this court that where a planter or commission merchant makes a cash sale of cotton, no title thereto passes into the buyer, though the property may be delivered into his possession, until it is actually paid for; and that an innocent purchaser from him acquires no title, and is not entitled to protection as against the owner. Flanders v. Maynard, 58 Ga. 57, 64; MacIntyre’s case, supra; National Bank v. Augusta Cotton Co., 104 Ga. 411.
2. Counsel for the plaintiffs in error further insisted that even if a planter selling cotton on cash sale had a legal right to follow it up and regain its possession from a third person who had innocently purchased it from the apparent owner of it, yet an action of trover would not lie against a cotton factor through whose hands the property had passed, if he did not have the custody of it at the time suit was instituted, but had previously in good faith, without any notice of the title of the true owner, sold the cotton in due-course of trade. This contention is fully met by the decisiqn of this court in Miller v. Wilson, 98 Ga. 567, wherein it was ruled that: “ An agent who, for and in behalf of his principal, takes the property of another without the latter’s consent is, as to him, guilty of a conversion, although, being ignorant of the true owner’s title, the agent may have acted in perfect good faith; and such agent may be sued in trover for the property, even after his delivery of it to his principal.” In the opinion filed in that case eminent authority is cited in support' of the proposition that: “ Whoever meddles with another’s property, whether as principal or agent, does so at his peril; and it makes no difference that in doing so he acts in good faith nor, in the case of an agent, that he delivers the property to his principal before receiving notice of the claim of the owner. If an agent takes the property of another without his consent and delivers it to the principal, it is a conversion, and trover will lie for the recovery of the property or for damages, as the plaintiff may elect.” See also, in this connection, the case of Hollins v. Fowler, 44 L. J. Q. B. 169, 2 Eng. Rul. Cas. 410, which,upon its facts, is specially in point. We accordingly hold in the present case that the defendants below occupied no better situation, relatively to the right of the plaintiff to assert title to the cotton in *486 controversy, than would the party from whom they received it, had the plaintiff brought an action of trover against him.
3. In the opinion delivered by Mr. Justice Cobb in the National Bank case, above cited, he reviews the several statutes passed by the General Assembly of this State touching the sale of cotton by planters and commission merchants, the provisions of which are now incorporated in our Civil Code, § 3546. The first of these enactments was a statute passed in 1854,entitled “an act for the protection, in certain cases, of planters and cotton sellers within the State of Georgia.” In the body of that act, section 1, it was declared that “ cotton sold by planters and commission merchants, on cash sale, shall not be considered as the property of the buyer, or the ownership given up, until the same shall be fully paid for, although it may have been delivered into the possession of the buyer; any law, usage, or custom to the contrary notwithstanding.” In' the second section of the act provision was made for the prosecution and punishment of any buyer of cotton so sold, who should, without first paying therefor, “make way with or dispose” of the same. See also Penal Code, § 539.
In the case of Flanders v. Maynard, 58 Ga. 57, this court undertook to construe the act last mentioned, and laid down the following rule for determining whether or not a sale of cotton was made with reference to its provisions: “ When the parties consider the sale complete in respect to both price and delivery, the title passes. When, on the other hand, they intend that final payment and final delivery shall yet take place and be concurrent acts, the title does not pass.” And it was accordingly held that “ Delivery, actual or constructive, under an express stipulation for retaining title till the price shall be paid, is but a conditional sale; and it preserves that character, in respect even to a subsequent bona fide purchaser. . ; Where the delivery is of cotton ” purchased “‘ on cash sale, ’ no express stipulation for the retention of title is necessary,” since, by virtue of the statute in such cases made and provided, “ the title of the seller remains undivested until payment is received in full.” In pronouncing the judgment of the court, Bleckley, J., said (pp. 63-4): “ In the selling of cotton by a planter or commission merchant, ‘ on cash sale/ ” this statute “ renders the sale executory until payment is made in full; until then no title whatever passes out of the seller, and, consequently, even *487 u bona fide purchaser for value and without notice can get no right as against him. The case is not like that of title obtained by-fraud, . . the, difference being that which exists between no title ■and voidable title. But only transactions ‘on cash sale’ are thus qualified . . by implication of law, and protected.” In other words, this court held that the legislative will, as expressed in the ■statute under construction, was: If the sale was on credit, the provisions of that act were not to apply. If, on the other hand, .there was actually a “ cash sale,” title to the property which was the subject-matter thereof should not be deemed to pass into the buyer, notwithstanding the possession of the property might be yielded to him by the seller, until the latter was paid in full the purchase-price agreed on ; but, on the contrary, the contract of sale •should be regarded as executory, both with respect to the delivery ■of and the payment for the cotton covered by that contract, until the buyer should have fully performed his express stipulation to pay in cash the purchase-price agreed on between the parties ; and that, to this extent, there should be an abrogation of the general rule of law regarding the sale of personalty, under which actual or constructive delivery of the article sold is to be considered •a performance on the part of the seller of an executory contract of ¡sale, and has the legal effect of immediately passing title to the property into the purchaser, irrespective of whether he has or has not performed his obligation to pay for the same.
That such was really the legislative intent is evidenced by enactments on the subject subsequently passed. In discussing the incidents growing out of the act of 1854, Speer, J., in delivering the opinion pronounced in the case of Sparrow v. Pate, 67 Ga. 355, took occasion to point out that as, under the terms of that statute, •the title to “ cotton sold on a cash basis ” did not pass into the buyer until it was paid for by him in full, if it should be destroyed by fire before payment therefor, the loss would necessarily fall •upon the seller. This statement was in accord with the well-recognized doctrine that the owner of personalty who voluntarily places it in the hands of a bailee must suffer any loss of the same not arising out of any fault on the part of the latter. See Randle v. Stone, 77 Ga. 503, and authorities cited. In the case of Gunn v. Knoop, 73 Ga. 510, it appeared that a “factor of an owner of cotton agreed to sell it for cash to the agent of a firm. . . It was to *488 remain in the warehouse of the factor until the next morning,, when it was to be paid for and turned out for shipment. . During the succeeding night, and before the time arrived for the payment of the money for the cotton, the warehouse in which it was stored was burned, and it was destroyed.” The contention of the owner of the cotton was, that it had been on the preceding day placed in the possession of the agent of the firm to which it was sold, and accordingly that firm should suffer the loss. Counsel for the owner insisted before this court that the decision announced in the case of Sparrow v. Pate was “ wrong,” and asked that it be reviewed and overruled. But this the court declined to do, saying, through Mr. Justice Blandford (p. 512): “ We have considered this request, and are satisfied that the decision complained of is. correct, not only as regards our own statute, but is fully sustained by common-law authorities.” This 'ruling was announced on November 11, 1884. During the following year, the General Assembly passed an act providing that in the event cotton, or other enumerated products, sold and delivered, under the provisions of the statute of 1854, should, after delivery thereof, be destroyed,, such loss should in nowise affect the seller’s right to collect the purchase-money. Acts of 1884-5, p. 52. So it will be seen that the legislature had in mind the protection of such planters and commission merchants as should actually sell for cash, the scheme being, not to create a lien in favor of a seller, irrespective of whether he sold for cash or on credit, but to provide that when he contracted to sell for cash, with the implied understanding that title to the property was not to pass till he was paid in full, his rights should not be affected by a fraudulent disposition of the property by the buyer,, or by its destruction while in his possession. That is to say, it was not in legislative contemplation that any purchase-money lien should attach to the property, in any event; but that a conditional sale made on a strictly cash basis should remain executory until payment was made in full, the contract between the parties-being that a surrender of the possession of the property should not have the effect of passing title thereto or giving the buyer a right to dispose of the same without fully living up to his agreement to-pay in money the purchase-price. Whether, in a particular instance, a sale was made for cash or on credit can be determined only by applying the cardinal rule for the construction of all con *489 tracts, viz., wnat was the intention of the parties ? This may often be difficult of ascertainment; but once ascertained, nothing remains to be done save to give effect to that intention, whatever may be the result, so far as third persons are concerned.
In the report of the case of Flanders v. Maynard, 58 Ga. 57, it is stated that, “ Whether it was understood between the parties that the title was not to pass until the money was actually paid, the testimony was conflicting.” The cotton sold had been weighed,, samples of it examined, and the purchase-price therefor definitely agreed on between the seller and a member of the firm to whom the cotton was sold. The members of that firm were identical with thosé of another partnership engaged in the banking business, with which latter firm the seller had an account as a depositor. He made no demand for,payment in money, but produced bis “bank pass-book” issued to him by the banking firm, took “ credit-in said book for the aggregate value of the cotton, as a sum then deposited by him in the bank, and after so doing [departed] satisfied, taking the book away with him, nothing being said touching a delivery of the cotton,” which was at the time stored in a warehouse, and the receipts for which were “in the hands of a clerk of the warehouseman, with whom they had been previously left by the owner of the cotton, in anticipation of a sale to other parties.” Judge Bleckley, in dealing with this feature of the case, observed (p. 62) that such a “transaction, in its ultimate form, amounts, prima facie, either to a loan of the value of the cotton, treating it as virtually paid for in cash, or to a modification of the terms of sale by converting a nominal cash bargain into a bargain on the credit of the partnership as banker.” As, however, there was no actual delivery at the time of either the cotton itself or the warehouse receipts therefor, this court held it was for the jury to determine whether or nor it was contemplated by the parties that-actual delivery should be dispensed with, and the buyer should be at liberty to call upon the warehouseman to turn over the cotton immediately, as fully paid for. In this connection, the learned judge who delivered the opinion of the court said: “ In a contract for the sale of cotton stored in a neighboring warehouse, both parties knowing it to be there, an intention to dispense with actual delivery may be inferred from circumstances, without any direct agreement; the circumstances including a settlement covering the- *490 whole price, and failure to stipulate anything concerning delivery. If the parties considered the sale complete in respect both to price and delivery, that is, that the buyers could take the cotton from the warehouse when they pleased, and the seller draw on them, as bankers, when he pleased, for the money specified in the entry upon the bank-book, the title passed. On the other hand, if the true intention of the parties was that, notwithstanding the entry upon the book, the cotton was to remain in the warehouse and under the control of the seller until the money should be actually paid to him or his order, or his agent — that is, that final delivery and final payment were to be concurrent acts, then title did not pass.” Thus, it will be seen, that case turned upon the question whether there had been a constructive delivery to the purchasing firm by the seller, or merely an actual wrongful and unauthorized delivery to that firm by the warehouseman, acting as the agent of the seller. The case of Rawls v. Saulsbury, 66 Ga. 394, is almost identical, upon its facts, with that just discussed. Indeed, counsel for the seller, against whom the jury found, appears to have conceded here that the decision rendered in the latter was controlling, “unless this court should reverse said decision.” (Seep. 397.) The court ■declined so to do, but expressly affirmed that decision and held '(p. 394): “ Where parties contracted for the sale of cotton, the vendor received a check on bank for the full purchase-price, delivered up the check, had the amount placed in a pass-book by the officers of the bank, and took possession of the pass-book as his own, the sale became complete, and the relation of debtor and creditor existed between the vendor and the bank.” .This bank, it is pertinent to remark, was “owned” by the members of a firm who “were merchants and cotton buyers, and were the same persons who purchased the cotton.”
It v'ery clearly appeared in Sparrow’s case, 67 Ga. 352, that the ■contract of sale was purely executory, there having been neither payment of any portion of the purchase-price of the cotton which was the subject-matter of that contract, nor any surrender, actual •or constructive, rof the possession of the property. “ An owner of ■cotton left it with a warehouseman for sale, leaving also the warehouse receipt, on presentation of which alone the cotton was deliverable ; the agent of certain cotton buyers contracted for the purchase of the cotton, indorsed on the receipt the price and his ini *491 tials, and returned it to the warehouseman for the purpose of collecting the purchase-price from the buyers. The warehouseman would not have delivered the cotton until paid for. Before presentation of the receipt, the warehouse, with the cotton still in it, burned.” In view of these facts, the court was constrained to hold that “ the title had not passed to the purchasers.” A similar transaction was brought to light on the trial of the case of Gunn v. Knoop, 73 Ga. 510. The cotton “ was weighed and the price agreed upon. It was to remain in the warehouse of the factor,” who was acting as the agent of the owner, “ until the next morning, when it was to he paid for and turned out for shipment.” As the cotton and the warehouse in which it was stored were destroyed by fire during the “night, and before the time arrived for the payment of the money for the cotton,” the owner found it to his interest to assert that the contract of sale was executed, so far as a delivery hy him of the cotton was concerned. However, this court seems to have had little difficulty in reaching the conclusion announced, “ that the title to the cotton, as well as its actual possession, remained in the seller.” A like ruling was made in Russell v. Abbott, 91 Ga. 178, with respect to a purely executory contract touching the sale of a quantity of cottonseed, which contract the prospective purchaser elected to treat as executed, in view of the fact that the cottonseed was levied on at the instance of a creditor of the owner before he actually delivered it at the place appointed as that at which it would be accepted by such purchaser. An ■equally plain instance of an executory contract of sale is presented hy MacIntyre’s case, 92 Ga. 166, 169. There, “ the cotton was sold according to the rules of the Savannah Cotton Exchange,” which expressly provided that cotton should “be sold for cash on ■delivery,” recited the fact that, under our State laws, title to cotton so sold remains in the seller “ until it is paid for,” and in terms declared that the buyer should “he considered as acting as a trustee in charge of the cotton for account of the seller from the time the seller allows him to take charge of it for the purpose of removal, or otherwise, until he shall have paid for it,” etc, etc. In the National Bank case, 104 Ga. 403, the cotton was sold under like rules adopted by the Augusta Cotton Exchange, and both of the parties to that case very properly treated the sale as one strictly for cash, and not on credit. The parties to the case now before us *492 do not, it is to be remarked, agree as to the character of the sale of the cotton in controversy; so it is incumbent upon us to set forth the circumstances under which that sale was consummated, and endeavor to point out what was, from a legal standpoint, at least, the true intent and meaning of the contract into which the plaintiff and the person to whom he sold entered.
4. The plaintiff, W. J. Harley, was a planter and the owner of twenty-five bales of sea-island cotton which he had raised on his plantation. Some time in February, 1901, J. H. Heery, who lived in Reidsville, went to Harley’s plantation, about nine miles distant, with a view to purchasing his cotton. They agreed on the price per pound, and the total amount to be paid for the twenty-five bales was fixed at $1,972.80. Heery asked that he be given “ time on half of it,” but Harley replied he “ could not sell [his] cotton that way at all,” — that he “was in a position where [he] had to have the cash for it; ” and “refused to extend credit for any portion of ” the cotton, on the ground that he “ was obliged to have, the cash for it.” Thereupon it was arranged between tbe parties that Harley should “ deliver the cotton at a steamboat landing on the Altamaha River, . . about 14 or 15 miles from Reidsville.” Either Harley or Heery then called upon one Giles, who was near by, but had not paid “ any attention to the trade between them,” to come and help them “mark up this cotton.” Giles assisted them in marking the cotton for shipment. As he and Heery started to leave together in a buggy, the latter said: “Now, Mr. Harley, you deliver the cotton at the bluff on the Altamaha, at the boat landing there, by Saturday anyway, and come over to Reidsville next week, and I will give you the draft (or give you the money) ” for the cotton. Giles, who testified as a witness on the trial of the case, was unable to say positively whether Heery promised to pay Harley in money or to give him a draft, but thought Heery said: “ I will give you a draft for your cotton.” On Friday evening, the next day after the trade was made, Harley carried out his obliga-, tion to haul the cotton to the river landing just mentioned, where he turned it over to the owners of a steamer, and took a bill of lading for it. The cotton was consigned to factors at Savannah with whom Heery dealt and with whom he had an account. On the argument here, counsel for the plaintiffs in error insisted that-if the agreement was that Harley was not to get the actual money. *493 but only a draft for the amount of the purchase-price, when he called on Heery the following week for a settlement, the transaction would not be a “ cash sale ” within the meaning of the statute. We can not concur in this view. Heery asked for credit as to one half of the purchase-price, but Harley positively refused to sell on that basis; whereupon the former apparently assented to pay all cash, for he went ahead and arranged for the shipment of the cotton, how it should be marked, etc, etc. If the remark he made on starting to leave was that he would give a draft for the purchase-price, he doubtless intended to convey the idea that such draft would be promptly paid, and would be accepted by Harley only on condition that it must be paid before the trade should be considered closed. At any rate, Harley was warranted in assuming that such was the understanding; and if he had subsequently turned over to Heery the bill of lading, on receipt of a draft for the full amount agreed on, there would certainly be no difficulty in reaching the conclusion that both parties contemplated a strictly “ cash sale,” with no credit feature about it. A draft given in settlement of a cash •demand is not to be regarded as extinguishing such demand, unless there be an express understanding that the draft is accepted unconditionally, as regards its payment. Stewart Paper Co. v. Pau, 92 Ga. 512.
5. In point of fact Heery did not give to Harley a draft for the full amount of the purchase-price of the cotton. On the contrary, when the latter, on the Monday following the Thursday on which the trade was made, called upon Heery for a settlement, he told Harley “he could not give [him] a draft for over $1,000, but would immediately arrange it for ” him — meaning, doubtless, that he [Heery] would at once undertake to arrange to make payment of the balance of $972.00. He was thereupon reminded by Harley that he had “ promised to pay [him] cash for ” the cotton. But Heery said he was unable then to give a draft for over $1,000 and Harley took a draft for that amount, and subsequently collected it. Presumably, he surrendered to Heery the bill of lading, for the cotton passed out of the possession of the carrier and into the hands of the factors in Savannah, who in dealing with the cotton treated it as the property of Heery. At the time this transaction occurred, Harley never agreed to give Heery any stipulated time for payment. So far as appears, nothing was said by either of the *494 parties, other than as above stated. Harley afterwards made demand on Heery for payment of the balance of the purchase-price, but without success. Harley then placed his claim in the hands of an attorney, who went to see Heery several times with a view to collecting the money. Heery always said, when demand was made upon him for payment, that “he was in a tight right then, and he was expecting to sell his cotton, and would pay it at once.”' The attorney told Heery, when pressing him for settlement, that ,“ Harley seemed to be anxious about his money, and wanted it at-once.” The attorney on none of these occasions extended the time of payment, nor did Harley ever agree to do so. Heery did not make payment, so on October 3, 1901, Harley, through counsel employed by him, made a written demand upon one of the defendants below to pay the balance due on the cotton; and upon refusal to do so, Harley filed the present action. It is urged in behalf of the plaintiffs in error that when Harley was informed by Heery that the latter was not in a position to fulfill his obligation to give a draft for the full amount agreed on as the price to be paid for the cotton, it was optional with Harley to treat Heery’s failure to perform as a breach of contract; and that when Harley, instead of electing to treat the contract as broken, agreed to accept, and actually accepted, a draft for only $1,000, upon Heery’s proposal to give a draft for that amount at once and to immediately arrange-for the payment of the balance of the purchase-money, he (Harley) necessarily assented to a novation of the original contract, whereby credit was extended to Heery for the $972 which he was then unable to pay. And, in this connection, counsel argue that as no definite period was fixed as the date upon which this balance was to be paid, the law would imply an understanding on the part of the parties that a reasonable time was to be allowed Heery within which to raise the money and make payment. In other words, counsel contend that the parties abandoned the idea of selling on a cash basis, and that Harley was induced to make a delivery of the-cotton intended to pass title, upon receiving Heery’s draft for $1,000, accompanied by a promise to promptly raise and make payment of the balance of the purchase-price.
We can not agree that such was the intention of the parties. When the cotton was first bargained for, credit was asked and refused, and both the parties assented to a sale on a strictly cash *495 basis. Heery promised to make payment in full the following week. When called on Monday, he was unable to do so, and really only asked that the time of payment be extended for a short while in order that he might raise funds with which to pay the difference between the purchase-price and the amount of the draft he was then able to give. He did not renew his request for credit, or give any intimation that he would have to acquire a right to dis-: pose of Harley’s cotton in order -to complete payment; so the latter, was not put on notice that he was expected to assent to a nova-; tion whereby there should be an immediate delivery of the cotton’ passing title. His surrender of the bill of lading was not inconsistent with a determination on his part, previously expressed, to^sell for cash only, and not to convey title-till he was paid in full; for he might have intended, and probably did intend, to surrender the bill of lading merely as a matter of good faith and as a pledge not,to dispose of the cotton to any one other than Heery. The latter,; for aught that appears to the contrary, desired to gain control over' the bill of lading simply in order to secure his payment, by draft, of $1,000 on the cotton, and not for the purpose of selling or other? wise disposing of the cotton prior to payment by him of the bal-, anee of the purchase-price. He had bound himself to buy “ oh, cash sale,” and was apparently anxious to hold on to his trade and get the cotton at the price per pound agreed upon, if Harley would, extend for a few days the time within which payment in full, should take place. Harley did agree, evidently, to so extend .the time for payment; and, to this extent, there may be said to have-been a novation of the original contract, under which Heery' was-to pay cash, or its equivalent, on demand made during the week succeeding that in which the trade occurred. But, it is to be observed, nothing whatever was said touching a change in the cash feature of the original contract of sale; so it can not reasonably be contended there was a novation whereby the cotton was to be sold partly on credit, instead of upon a strictly cash basis, with the result that title passed immediately into Heery upon payment of the draft-for $1,000. To effect such a change in the contract as at first assented to would require affirmative action on the part of Heery. He made no proposal looking to a conversion of the cash trade, with reservation of title, into a credit sale which should immediately pass title. He would have no right to infer and act upon the ■ *496 .assumption that, by surrendering the bill of lading, Harley intended to part with title; for, as has been seen, the statute negatives the idea that mere delivery of the property, when there is a cash sale, operates to divest the seller of title. Only one change in the contract of sale was suggested, viz., an extension, for a few days, of the time within which Heery would have the privilege of acquiring, ■“ on cash sale,” Harley’s cotton, by paying in full the purchase-price as a condition precedent to getting title to the property. To this change, and to this change only, Harley assented. He was not bound to do so, it is true; for he might have treated Heery’s failure to pay cash on demand as a breach of contract, and resold the cotton at the prevailing market price, holding the latter responsible for the difference, if any, between that price and the contract price, if the cotton brought less than he had agreed to pay for it. But certain it is, looking to the testimony of Harley, who was the sole witness giving an account of what transpired between Heery and himself when he first called for payment, and whose testimony was in no way contradicted or impaired, that he (Harley) never intended, by way of novation, to assent that the contract of sale should lose its character as a conditional sale on a strictly cash basis, and become an unconditional sale on credit. And we think it equally clear that he neither did nor said anything on the occasion just referred to which would warrant Heery in supposing that Harley contemplated a credit sale and surrendered possession of the bill of lading with the intention that his so doing should operate as a constructive delivery of the cotton, immediately passing title thereto. Our conclusion therefore is that, as to this branch of the case, a finding in favor of the plaintiff was demanded by the evidence; and, if so, it follows that there should not be a new trial because of error, if any, committed by the trial judge in charging the jury as to what would constitute a cash sale under the statute, or in refusing to give in charge pertinent requests upon this subject.
6. Applying to the' facts of this case the law, as herein laid down, respecting the liability of factors to account to the owner for property which they have innocently disposed of, believing it belonged to another from whom they received it, we are of the opinion that there was ample evidence of a conversion by each of the defendants. The amount of the verdict returned against them was $930.73. It might well have been for $972.80, the unpaid *497 balance of the purchase-price, with interest thereon; for there was shown a conversion hy two of the defendants of the entire lot of •cotton, while the other made an unauthorized disposition of twenty bales of the same. This being established hy uncontradicted evidence, it is unnecessary to consider whether his honor of the trial bench did, or did not, correctly instruct the jury as to what would, •as matter of law, constitute a conversion, and as to how they were to arrive at the amount of their verdict, in the event they found in favor of the plaintiff. The form of the verdict returned was: “We, the jury, find for the plaintiff in the sum of nine hundred, thirty & 73/100 dollars ($930.73). W. W. Mallard, foreman.” This was a sufficiently definite finding against all of the defendants to the action, for the amount stated. See Civil Code, § 5332. For no reason assigned in the motion for a new trial should this finding be set aside. Judgment affirmed.

By five Justices.