PATE *et al.* *v.* WYLY & COMPANY *et al.*

1. A partnership is not bound by a judgment rendered against a member thereof in a suit to which it was not a party and which was brought against such member in his individual capacity to dispossess him of property over which he had assumed control, claiming that the firm of which he was a member had title thereto.

2. Under the facts brought to light on the trial of this case, a finding in favor of the prevailing party was wholly unwarranted, the evidence showing conclusively that such party never acquired title to the property in dispute, either by an actual or a constructive delivery of the same by the person who was in possession of it as owner.

Argued June 11, — Decided June 30, 1903.

Money rule.   Before Judge Evans.   Wilcox superior court.   August 1, 1902.

*M. B. Cannon* and *Eldridge Cutts*, for plaintiffs.
*Hal Lawson* and *E. D. Graham*, for defendants.

Fish, J.   It is unnecessary to set forth in detail all the facts disclosed by the record before us, or to state how the litigation arose.   Suffice it to say that the case turns upon the question whether or not, in August, 1900, J. I. Bruce, one of the plaintiffs in error, sold and delivered to Geo. P. Wyly & Co., the successful party in the court below, three rafts of timber then in the possession of the former.   During the month of March, 1900, Bruce sold to the firm of Geo. P. Wyly & Co. certain other timber, that firm giving him two drafts drawn on Schmidt & Wyly, of Darien, Ga., to which latter firm the timber was subsequently delivered.   Bruce transferred these drafts by indorsement to one King, a private banker, who advanced to him money thereon.   After the timber came into the possession of Schmidt & Wyly, a claim thereto was interposed by other parties, and that firm declined to pay the drafts drawn on it.   The matter was finally settled by Geo. P. Wyly & Co. agreeing with Bruce to rescind the sale and allow the timber to be resold.   The two drafts drawn by that firm on Schmidt & Wyly were not surrendered by Bruce, but remained outstanding in the hands of King.   He afterwards notified the firm of Geo. P. Wyly & Co. that he would hold it liable on these drafts if Bruce did not repay the money advanced to him on the faith of the same. King and Lon. Dickey, a member of that firm, tried to get Bruce to adjust this matter, and he told them that "If Geo. P. Wyly & Co. would continue to purchase timber from him, he would allow the purchase-money over and above expenses to be applied to the amount due on the drafts to King," saying he could, in this manner settle with King in full by June, 1900.   Subsequently Geo. P. Wyly & Co. did purchase from Bruce several rafts, and he permitted the firm to pay over to King a portion of the purchase-price

of each raft, to be applied on the drafts.    On or about August 7, 1900, Dickey, acting as the representative of the firm of which he was a member, entered into an executory agreement with Bruce as to a sale of the three rafts of timber first above mentioned.    At that time the "timber was not through being rafted," but Dickey and Bruce agreed upon what basis the purchase-price was to be fixed after the rafts had been measured and the quantity of timber thus ascertained    Dickey said the market price of timber was going down, and, in order to bind Schmidt & Wyly (for which firm Geo. P. Wyly & Co. really acted in the capacity of a broker), he wanted to close the trade by giving to Bruce a draft for $100, drawn on Schmidt & Wyly, as a part payment of the purchase-price.    To this arrangement Bruce assented, and Dickey gave to him a draft for that amount on Schmidt & Wyly.    On this occasion nothing appears to have been said with regard to what portion, if any, of the purchase-price Bruce was to allow Geo. P. Wyly & Co. to pay over to King, the holder of the two drafts previously drawn on Schmidt & Wyly but dishonored by that firm.

On August 10, Dickey and King went to see Bruce with a view to getting his consent to allow Geo. P. Wyly & Co. to withhold a sufficient amount of the purchase-price of the three rafts to discharge in full King's claim.    Dickey and King knew Bruce "was going out of the mill business and would not cut any more timber, and that King's money would have to be made out of this timber." Dickey asked Bruce to allow him to give to King a draft covering the full amount of his claim; but to this Bruce would not consent, saying he wanted to wait until the timber had been measured, and that he would then arrange the matter by doing what he could and "what was right."    He neither agreed to permit King to be paid in full nor consented that any specified sum should be withheld by Dickey and applied to the satisfaction of King's demand.    On the following day Dickey measured the timber in the three rafts, and late in the afternoon went to Bruce's commissary for the purpose of paying him the balance of the purchase-price, which amounted to something more than $1,200 over and above the draft for $100 already in Bruce's hands.    Dickey produced a statement prepared by King, showing the amount of his claim against Bruce, which was in the neighborhood of $670, and told him he (Dickey) "was ready to pay him the balance of something over $500 in money,

·then and there." Bruce replied he did not intend to allow Dickey
and King to dictate what debts he should pay, and that he would
not pay the King debt.   Dickey thereupon drew from his pocket
.a roll of money with the intention of making a tender to Bruce of
the amount of the purchase-price of the timber less the sum rep-
resented to be still due King and the $100 for which a draft had
already been given Bruce.   In order to prevent Dickey from mak-
ing this proposed tender, Bruce " blew out the lamp " by which the
commissary was lighted.   Dickey then said he intended to take
·the timber, as he had bought it.  Bruce replied that Dickey would
. be unable to do so, as by Monday morning the timber would be
·covered by liens amounting to more than its value.   It appears
that Dickey did undertake to assume control over the timber by
placing men in charge of it.   On Monday, the 13th of August,
Bruce sued out a possessory warrant against Dickey and these men,
.and on the trial of the issue thus raised, the court from which the
warrant issued rendered a judgment in favor of Bruce, which judg-
ment has never been set aside, but is final.   Bruce, on the same
·day, sent the draft for $100 by mail to Geo. P. Wyly & Co., and
that firm never returned the same to him.

On the hearing of the present case in the court below, the facts
·above recited were brought out by the evidence introduced pro and
con, and the jury returned a verdict in favor of Geo. P. Wyly &
Co.  Bruce and another party at interest, R. O. Pate, who claimed
under him, made a motion for a new trial; and upon the overrul-
ing of the same, brought the case to this court for review.

1. Aside from the general grounds that the verdict was contrary
to law and the evidence, etc., the motion for a new trial embraced
a special ground assigning error upon the following charge:  " The
plaintiffs have introduced in evidence the proceedings in a posses-
sory-warrant case concerning the timber which is in dispute in this
case, in which the possession of the timber was awarded to Mr.
Bruce.  I charge you that the judgment in that case merely estab-
lished the right of possession, and has no bearing on the question
·of title to the timber, except so far as the matter of possession may
incidentally throw light on the truth of the case.   The title was
not involved in that proceeding, and therefore [it] is not conclusive
of anything involved in this case."  It is insisted that this charge
was erroneous, because: (1) " the possession having been adjudicated

in Bruce, there could be no complete delivery of the timber to Wyly & Co., and hence the alleged sale could have never been completed;" and (2) "under the facts in this case, this charge too greatly restricted the effect of the adjudication of possession." The obvious reply to these criticisms on the charge is, that while Dickey was a member of the firm of Geo. P. Wyly & Co., the possessory-warrant was directed against him in his individual capacity, as it was likewise issued against the men he had put in charge of the timber; and accordingly, though he was personally bound by the judgment rendered in favor of Bruce, that judgment was not conclusive upon Geo. P. Wyly & Co., that firm being in no sense a party to the proceeding. Indeed the evidence introduced in this connection had no relevancy at all, save as throwing light upon the conduct of Bruce and tending to show that he had never, in point of fact, made any delivery of the timber to Dickey as the representative of his firm.

2. We are, however, of the opinion that the general grounds of the motion for a new trial should have been sustained. The promise made by Bruce to King and Dickey, to the effect that " if Geo. P. Wyly & Co. would continue to purchase timber from him [Bruce], he would allow the purchase-money over and above expenses to be applied to the amount due on the drafts " held by King, was not a promise that was capable of enforcement. It was without consideration. Dickey did not, as the representative of Geo. P. Wyly & Co., agree to purchase from Bruce any additional timber, and Bruce did not make mention of the terms upon which he would sell should that firm subsequently wish to buy from him. That this proposition was made by him was a relevant fact only as tending to show it was made the basis of a subsequent course of dealings between Bruce and Geo. P. Wyly & Co. He did sell to that firm additional timber, and did allow King to be paid a portion of the purchase-money of each raft sold. But it does not appear that in any instance the sum turned over to King represented " the purchase-money over and above expenses," or that Bruce recognized he was bound by his promise to allow King all profits on each sale. On the contrary, it is inferable that in each instance he was left free to decide for himself, after the price to be paid was ascertained by measuring the timber in the particular raft or rafts he offered for sale, what sum he would allow Geo. P. Wyly & Co. to turn over

to King, irrespective of whether that sum did or did not corres-
pond with the amount of the profits realized on the transaction.
The testimony with regard to what transpired with reference to the
three rafts which are the subject-matter of dispute in this case goes
to show that this was true.    Nothing was said on August 7, by
either Bruce or Dickey, as to how much of the purchase-price of
these three rafts should be allowed to go to King.   On August 10,
King and Dickey, apparently recognizing that they would have to
come to some agreement with Bruce as to the amount he would
allow King to have, went to see Bruce and endeavored without suc-
cess to get him to agree that King's claim might be paid in full
out of the proceeds of the timber.   This action on the part of King
and Dickey was wholly inconsistent with the theory that there was
an established course of dealings between Bruce and Geo. P. Wyly
& Co. whereby, when nothing was said to the contrary, it was un-
derstood by both parties that out of the purchase-price of every
raft sold to that firm King was to be paid a sum equal to and cor-
responding with the amount of profits realized by Bruce on the sale.
The timber had not, on August 10, been measured, and therefore
the purchase-price of the same was not known.   If there was any
understanding such as that just indicated, it was entirely unneces-
sary for King and Dickey on that day to endeavor to induce Bruce
to consent that a sum corresponding with the amount of profits he
would make on the trade should go to King; for this sum could
not be ascertained until the timber was measured, and if Bruce was
bound to turn over to King all profits as soon as the amount thereof
was fixed in this manner, Bruce's consent was not essential.   There
was no evidence whatever as to what was "the purchase-money
over and above expenses " incurred by Bruce in preparing the tim-
ber for market, nor any hint even of the profits he would have real-
ized on the sale if consummated.   This being so, it does not appear
that Dickey had any right to demand that Bruce should allow
King's demand to be satisfied in full out of the proceeds of this
particular timber.    The real truth of the matter seems to be that
Dickey, on August 10, recognized that Bruce was not bound to
allow any such payment to be made to King; and that King and
Dickey, knowing Bruce was going out of the mill business and
that King's only chance to get his money was by procuring the
consent of Bruce to permit him to be paid in full out of the funds

realized from the sale of the three rafts which Geo. P. Wyly & Co. had, on August 7, contracted to buy, went to Bruce and tried to persuade him to let Dickey withhold out of the purchase-price of the timber, whatever it might be, enough money to pay King in full, and thus relieve Geo. P. Wyly & Co. of all liability on the drafts in his hands.   Bruce declined positively to agree to this arrangement, and never then or subsequently consented that King might be paid a single dollar out of the proceeds of the timber. This being so, the tender which Dickey attempted to make to Bruce on August 11, after the timber had been measured and the amount to be paid therefor had been determined, could in no way have affected the status.

It necessarily follows from what has been said above that there was never any delivery, actual or constructive, to Dickey as the representative of Geo. P. Wyly & Co.   See, in this connection, *Flannery* v. *Harley*, 117 *Ga.* 483, and cases cited.   The sale was to be for cash, in accordance with what the evidence showed was the usual custom which obtained among all buyers of timber who engaged in the business as brokers, and the only dispute was as to whether or not Bruce was bound to allow Geo. P. Wyly & Co. to pay a portion of the cash purchase-price over to King instead of directly to himself, as the seller.   Clearly it was not contemplated that delivery should precede payment.   Dickey, who appeared as a witness in behalf of Geo. P. Wyly & Co., undertook to assert: "After this timber was measured, it was my risk, and there was nothing to be done by Bruce to complete the contract of sale to me."   But this was a bare conclusion on his part, unsupported by the facts to which he testified, if he really meant more than that it was not contemplated by the parties that, after he had settled with Bruce for the purchase-price agreed on, Bruce was to do anything more than to permit Dickey to assume immediate control over the timber and treat it as belonging to Geo. P. Wyly & Co., although there had not been any actual physical delivery of it to him.   In other words, it is clear that the parties understood that payment and delivery were to be concurrent acts, and that title was not to pass before actual payment in full of the purchase-price, either directly to Bruce himself or, with his assent, to King or some other person designated to receive the money.   In no view of the

case was a finding in favor of Geo. P. Wyly & Co. warranted, and the verdict of the jury must be set aside.

*Judgment reversed. By five Justices.*