**UNITED STATES of America, Appellee,**

v.

**Ellison M. STOCKTON, Appellant.**

No. 84–5215.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 8, 1985.

Decided April 9, 1986.

212

Jack L.B. Gohn (Gerard P. Martin, Baltimore, Md., on brief), for appellant.

James Barr Moorhead, Asst. U.S. Atty. (Catherine C. Blake, U.S. Atty., Barbara S. Sale, Asst. U.S. Atty., Baltimore, Md., on brief), for appellee.

Before HALL, MURNAGHAN and WILKINSON, Circuit Judges.

MURNAGHAN, Circuit Judge:

Ellison Stockton appeals from his conviction of embezzlement of the assets of a labor union in violation of 29 U.S.C. § 501(c).[1] Stockton makes four arguments: (1) that the district court's instructions to the jury incorrectly stated the elements of the statutory violation; (2) that there was insufficient evidence to support the jury's verdict; (3) that certain testimony claimed to be prejudicial should not have been admitted; and (4) that a new trial should have been granted on the basis of newly discovered evidence.

I.

At the time of the events in question here, Ellison Stockton was the president of Local 239 of the United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW), a labor organization with over 5,000 active members in the Baltimore area. Stockton was first elected to the presidency of the local in 1961, and remained in office until 1967. In 1969, he was reelected to the presidency, an office he retained until the time of his conviction.

---

1. 29 U.S.C. § 501(c) provides:

**(c) Embezzlement of assets; penalty**

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

The building housing the union's offices was owned and managed by an affiliated corporation called the Local 239 Holding Company. The union's Executive Board also served as the board of directors of the Holding Company, and Stockton acted as chairman of the Holding Company board. The Holding Company board met approximately once each year. Stockton apparently had great influence over the other Holding Company directors. Members of the Holding Company board who testified at trial could recall no instance in which the board had defeated a proposal made by Stockton.

Members of the Holding Company board also testified that the board had effectively delegated to Stockton the authority to make decisions concerning the day-to-day cleaning and maintenance of the building. Their testimony indicated that the members of the board did not inquire into such matters as long as things were running smoothly.

In late 1976, the union contracted with Herbert Branch Janitorial Service, Inc., for cleaning the union offices. Branch's monthly charge was $694.00, plus $291.00 for an initial cleaning. Branch submitted monthly invoices and was paid by checks sent through the mail. After only two months, the union terminated its contract with Branch. Stockton notified his office staff that he had engaged the M. Woods Janitorial Service to perform maintenance services at the union offices. Stockton instructed his secretary to draw checks payable to M. Woods in the amount of $200.00 per week. The checks were co-signed by the vice-president of the local, Rodney Trump, and left on Stockton's desk to be picked up by M. Woods.

The government's evidence tended to show that the M. Woods Janitorial Service was fictitious. Stockton never provided his staff or other members of the Holding Company board with an address or telephone number for M. Woods. No written contract was signed, and the office staff never prepared any forms or records relating to the janitorial service. There was no

telephone listing for an M. Woods Janitorial Service in the greater Baltimore area. No corporate charter was registered under the name with the Maryland Department of Assessments and Taxation. No witness ever observed a vehicle or other equipment bearing the name "M. Woods Janitorial Service." One union member's grand jury testimony, which was introduced at trial, indicated that, to her knowledge, the M. Woods Janitorial Service was a "joke," and that the cleaning was being done by union members. The prosecution also established that all of the checks drawn to the order of the M. Woods Janitorial Service were deposited in one of Stockton's three bank accounts. There was expert testimony that at least one of the "M. Woods" endorsements was written by Stockton's wife, Mildred. Mildred Stockton had used the surname Woods before her marriage.

The evidence indicated that regular cleaning of the union offices was performed by someone. However, there was testimony that the level of cleaning during the tenure of the M. Woods Janitorial Service was not always satisfactory.

In December, 1978, Stockton told the Holding Company directors that the janitorial service had asked for an advance payment to finance the purchase of new equipment. The board authorized Stockton to issue an advance in an amount somewhere between two and three thousand dollars. Stockton made other "advances" to the janitorial service which were not cleared by the board. When the union vice-president, Rodney Trump, questioned Stockton about several checks payable to M. Woods in large amounts, he was told that the checks were advances to the janitorial company for the purchase of equipment. Each of the large "advance" checks was deposited into one of Stockton's bank accounts. In almost every instance, Stockton drew on the deposit immediately to pay personal expenses.

In August, 1982, Stockton terminated the union's arrangement with the M. Woods Janitorial Service. Genevieve Kruhl, the

mother of a union member, was hired to clean the offices at $200.00 per week.

Stockton's version of the facts differed in several respects. He testified that there was indeed an M. Woods who performed cleaning services. He stated that Woods' first name was Mark, and provided a physical description of him. Stockton testified that Woods had been recommended to him by a former union official who had died in 1981. He claimed that the checks had been deposited to his accounts because he had cashed the checks and paid Woods in cash.

On February 16, 1984, Stockton was indicted on eleven counts of embezzlement of the assets of a labor union in violation of 29 U.S.C. § 501(c). The case was tried before a jury. During the trial, the government called as a witness Sandra Simmons, a union member and longtime acquaintance of Stockton and his wife. Before the grand jury, Simmons had testified that she had been aware that the M. Woods Janitorial Service was a "joke" and that the cleaning of the offices was being done by union members. Her testimony was otherwise at trial and unsatisfactory from the government's point of view. The government sought to impeach her trial testimony by introducing into evidence her prior contradictory statements before the grand jury. Simmons' earlier testimony further indicated that she had been threatened by associates of Stockton at the time of the grand jury proceedings. She had testified that a union member had removed the battery from her car on the day she was scheduled to testify before the grand jury, and that Mildred Stockton had told her that a "bodyguard" would "take care of" any-

one who harmed Stockton in connection with the grand jury investigation. The court carefully instructed the jury that the grand jury testimony was admitted solely for the purpose of impeaching the credibility of Simmons' trial testimony, and added that the evidence should not be considered "for the purpose in any way of connecting Mr. Stockton with any such statements, because there is absolutely no evidence that if any such statements were made that Mr. Stockton had anything whatsoever to do with them."

At the close of the government's evidence, and again at the end of trial, Stockton moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. Both motions were denied. On May 4, 1984, the jury found Stockton guilty on all counts. The court sentenced Stockton to concurrent prison terms of one year and one day for the first six counts. For the remaining counts, the court gave Stockton a suspended sentence and placed him on probation for five years. As a condition of his probation, Stockton was required to make restitution to the labor union in the amount of the lesser of $23,250 (the aggregate amount of the embezzlement charged in the indictment) or fifteen percent of his income over the five-year period.

## II.

We have not previously had occasion to address the interpretation of 29 U.S.C. § 501(c) as it applies to cases like the one presently before us. The courts that have considered the issue have adopted a variety of approaches, from which emerges a complicated and at times confusing pattern.[2]

---

**2.** The Fifth and the Eighth Circuits appear to hold that a violation of § 501(c) is made out if the defendant appropriated or expended union funds without union authorization and lacked a good-faith belief that his action was authorized. *United States v. Dixon,* 609 F.2d 827, 828 (5th Cir.1980); *United States v. Nell,* 526 F.2d 1223, 1231–32 (5th Cir.1976); *United States v. Goad,* 490 F.2d 1158, 1161–65 (8th Cir.1974), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974). The Second Circuit has held that the government must prove, in addition, that the defendant lacked a good-faith belief that the expenditure of funds would benefit the union.

If the defendant possessed such a belief, no violation is made out, even though the defendant knew the expenditure was unauthorized. *United States v. Santiago,* 528 F.2d 1130, 1133–34 (2d Cir.1976), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *United States v. Ottley,* 509 F.2d 667, 671 (2d Cir.1975). At one time, the First Circuit appeared to agree with the Second Circuit, *see Colella v. United States,* 360 F.2d 792, 804 (1st Cir.1966), *cert. denied,* 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966), but in a more recent decision it seems to have come around to the view of the Fifth and

Because for the purposes of the present case, at least, we are persuaded that the answer to the problem is simpler than application of broad principles may make it appear, we pursue an independent analysis of § 501(c).

The specific question presented by the case now before us is the proper construction of the statutory concept of embezzlement. Although § 501(c) reaches other theft offenses as well, it is clear that embezzlement is the statute's primary concern. The section is captioned "embezzlement of assets," and its legislative history refers to it as a provision designed to impose a federal punishment for embezzlement. S.Rep. No. 187, 86th Cong., 1st Sess. (1959), *reprinted in* U.S.Code Cong. & Ad.News 2318, 2329, 2359, 2401; H.R. Rep. No. 741, 86th Cong., 1st Sess. (1959), *reprinted in* U.S.Code Cong. & Ad.News 2424, 2432. Moreover, as the present case has been tried, it appears that embezzlement, rather than one of the other specified offenses, should be the focus of our inquiry. Unlike other theft crimes, embezzlement presupposes that the appropriated property was already lawfully in the defendant's possession at the time of its appropriation. That is the situation here: as president of the union, Stockton had possession of union funds, in a fiduciary capacity, before the payments to the M. Woods Janitorial Service were made.[3]

Looking first to the language of § 501(c), we note that Congress chose to use the term "embezzle," a term which had already acquired a generally accepted legal meaning in court decisions interpreting state statutes.[4] The deliberate use of the term suggests that Congress intended to reach the same conduct, and that the extent of the federal offense should be viewed as roughly identical to the scope of the offense as generally interpreted under state law. As the Supreme Court has noted, "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952).

Nothing in the legislative history of § 501(c) contradicts the conclusion that Congress meant to adopt the traditional concept of embezzlement. Indeed, a minority of the Senate committee objected to the provision on the ground that it merely duplicated state criminal law and thus gave

Eighth Circuits. *United States v. Sullivan,* 498 F.2d 146, 152 (1st Cir.1974), *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265 (1974).

Where the appropriation or expenditure was purportedly authorized by a superior union official, the First, Fifth, and Sixth Circuits have held that a violation is made out if the prosecution shows that the defendant lacked a good-faith belief that the expenditure would benefit the union. *United States v. Gibson,* 675 F.2d 825, 828 (6th Cir.1982), *cert. denied,* 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982); *United States v. Dixon,* 609 F.2d 827, 828 (5th Cir. 1980); *United States v. Bane,* 583 F.2d 832, 835–36 (6th Cir.1978), *cert. denied,* 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979); *Colella v. United States,* 360 F.2d 792, 804 (1st Cir.1966), *cert. denied,* 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966). More recently, the Eighth and Ninth Circuits appear to have abandoned the distinction between "authorized" and "unauthorized" expenditures and hold that an expenditure or appropriation violates § 501(c) if the defendant acted with "fraudulent intent," *United States v.*

*Welch,* 728 F.2d 1113, 1116–18 (8th Cir.1984); *United States v. Thordarson,* 646 F.2d 1323, 1334–37 (9th Cir.1981), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981).

3. We accordingly do not deem it appropriate here to pursue the question of whether a theft, a willful abstraction, or a willful conversion amounting to a violation of the statute has occurred.

4. Embezzlement is a statutory crime which did not exist at common law. Common-law larceny offenses extended only to conversions of property involving a wrongful taking and asportation of the property, as well as wrongful control or detention. A defendant who obtained possession of property lawfully, in a fiduciary capacity, before converting it could not be convicted at common law. Embezzlement statutes were enacted to remedy the common law's deficiency. W. LaFave & A. Scott, Criminal Law 644–45 (1972).

union members nothing they did not already have. S.Rep. No. 187, 86th Cong., 1st Sess., *reprinted in* U.S.Code Cong. & Ad.News 2318, 2401 (minority views). We therefore find ourselves in agreement with the courts that have looked to traditional principles of embezzlement in construing § 501(c). *See United States v. Thordarson,* 646 F.2d 1323, 1334–35 (9th Cir.1981), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981); *United States v. Silverman,* 430 F.2d 106, 126–27 (2d Cir. 1970), *modified on other grounds,* 439 F.2d 1198 (1970), *cert. denied,* 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971).

■■■ The central element of the traditional concept of embezzlement is the conversion of property belonging to another. *E.g., People v. Riggins,* 13 Ill.2d 134, 148 N.E.2d 450, 452 (1958); *Bowen v. State,* 206 Md. 368, 111 A.2d 844, 847 (1955); *State v. Doolittle,* 153 Kan. 608, 113 P.2d 94, 96 (1941); *State v. Holley,* 115 W.Va. 464, 177 S.E. 302, 303 (1934); W. LaFave & A. Scott, Criminal Law 644–46 (1972). Conversion involves an act of control or dominion over the property that seriously interferes with the owner's rights.[5] *E.g., State v. Holley,* 115 W.Va. 464, 177 S.E. 302, 305 (1934); *State v. Britt,* 278 Mo. 510, 213 S.W. 425 (1919); *McAleer v. State,* 46 Neb. 116, 64 N.W. 358 (1895); *Rushin v. Tharpe,* 88 Ga. 779, 15 S.E. 830, 830 (1892). It is important to note that the act of dominion or appropriation must be without authorization from the owner of the property. The notion that the act of dominion or appropriation is contrary to the wishes of the owner, or at least without clear permission from the owner, is inherent in the concept of conversion. *See Morissette v. United States,* 342 U.S. 246, 271–72, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952); *State v. Holley,* 115 W.Va. 464, 177 S.E. 302, 305 (1934). There can, of course, be no interference with the owner's rights to the property if the owner has given permission to the act in question. The mental state required for conversion is purely and simply a specific intent to appropriate the property.[6] Knowledge that the property belongs to another, or that the appropriation is unauthorized by the owner, is not necessary. *Morissette v. United States,* 342 U.S. 246, 270, 72 S.Ct. 240, 253, 96 L.Ed. 288 (1952); W. LaFave & A. Scott, Criminal Law 645 (1972).[7]

■■■ The crime of embezzlement builds on the concept of conversion, but adds two further elements. First, the embezzled property must have been in the lawful possession of the defendant at the time of its appropriation. *See, e.g., People v. Riggins,* 13 Ill.2d 134, 148 N.E.2d 450, 452 (1958); *MacEwen v. State,* 194 Md. 492, 71 A.2d 464, 469 (1950); *State v. Harrison,* 347 Mo. 1230, 152 S.W.2d 161, 165 (1941). Second, embezzlement requires knowledge that the appropriation is contrary to the wishes of

5. Such interference amounts to a conversion regardless of the manner in which the defendant obtains possession of the property. Thus, a conversion can occur through a violent taking, but it can also occur following the lawful entrustment of the property to the defendant. *See, e.g., Bowen v. State,* 206 Md. 368, 111 A.2d 844, 845–46 (1955); *Flannery v. Harley,* 117 Ga. 483, 43 S.E. 765, 765 (1903); LaFave & Scott, Criminal Law § 89 at 645–47 (1972).

6. For that reason, conversion, without more, is generally not a crime, although it is a civil tort. In *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), the Supreme Court held that a criminal statute would not be interpreted to criminalize conversion alone in the absence of a very clear statement to that effect, due to the lack of a requirement of wrongful intent for conversion. However, "willful" or "knowing" conversion may be a crime, as the addition of those terms provides the wrongful intent that is lacking in conversion standing alone.

7. The point is also supported by cases involving the tort of conversion, which is identical to its criminal counterpart. Civil liability requires a specific intent to appropriate the property. Prosser & Keeton on Torts, § 15 at 92 (5th ed. 1984). A defendant may be civilly liable, however, even if he believed the property to be abandoned, *Poggi v. Scott,* 167 Cal. 372, 139 P. 815 (1914), or purchased the property in good faith from a thief, *McRae v. Bandy,* 270 Ala. 12, 115 So.2d 479 (1959); *Culp v. Signal Van & Storage Co.,* 142 Cal.App.2d Supp. 859, 298 P.2d 162 (1956); *Lovinger v. Hix Green Buick Co.,* 110 Ga.App. 698, 140 S.E.2d 83 (1964).

the owner of the property.[8] In less formal language, the defendant must have "taken another person's property or caused it to be taken, knowing that the other person would not have wanted that to be done." *United States v. Silverman*, 430 F.2d 106, 126–27 (2d Cir.1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). A defendant who exercises dominion over property in the good-faith belief that the property is his own, or that the appropriation is otherwise authorized, is not guilty of embezzlement. *E.g., Lewis v. People*, 99 Colo. 102, 60 P.2d 1089 (1936); *People v. LaPique*, 120 Cal. 25, 52 P. 40 (1889); W. LaFave & A. Scott, Criminal Law 652 (1972).

To sum up, then, the traditional concept of embezzlement comprises (1) a conversion—or, in other words, an unauthorized appropriation—of property belonging to another, where (2) the property is lawfully in the defendant's possession (though for a limited purpose) at the time of the appropriation, and (3) the defendant acts with knowledge that his appropriation of the property is unauthorized, or at least without a good-faith belief that it has been authorized.

 The traditional concept of embezzlement is readily applicable in the context of misconduct by union officials. One point, however, seems to have given the courts trouble, namely, the notion of authorization. Some courts have concluded that if what was clearly a misuse of union funds was expressly approved by a superior union official, the appropriation or expenditure must be considered to have been "authorized" by the union. Courts which have done so, however, have then proceeded to construct other theories to serve as the basis for upholding convictions.[9] *See, e.g.,*

*United States v. Gibson*, 675 F.2d 825, 828 (6th Cir.1982), *cert. denied*, 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982); *United States v. Dixon*, 609 F.2d 827, 827–28 (5th Cir.1980); *United States v. Ottley*, 509 F.2d 667, 671 (2d Cir.1975); *Colella v. United States*, 360 F.2d 792, 804 (1st Cir. 1966), *cert. denied*, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966). We do not see the need to construct a pitfall and then ingeniously to escape it. We are not prepared to attribute so great an effect to approval from a superior who, himself, in the first place was not authorized to give it. It bears repeating that the conversion of property that lies at the core of embezzlement must be without the permission of *the owner*, and contrary to the wishes of *the owner*. In the context of § 501(c), the owner of the property is the union itself—its collective membership—not individual union officials who are not vested with power to dissipate union funds in the manner currently before the court. An appropriation or expenditure of union funds is therefore unauthorized if it is done without the permission of *the union*, even if it is approved by a superior union official. The permission of the union is lacking if the appropriation or expenditure is outside the scope of the fiduciary trust placed in the defendant by the union as a whole and outside the scope of the powers of any superior union official on whose permission the defendant has sought to rely.

 The jury instructions given here adequately conveyed the central elements of embezzlement under § 501(c). The district court's charge defined "embezzle" to mean "willfully to take or convert the property of another which came into the wrongdoer's possession lawfully by virtue of his

**8.** It is this element—knowledge that the appropriation is outside the scope of the trust placed in the defendant by the owner of the property—that appears to have been the focus of judicial inquiry under the label "fraudulent intent." *See, e.g., United States v. Welch*, 728 F.2d 1113, 1118 (8th Cir.1984).

**9.** Those courts have primarily relied on the theory that an authorized expenditure can be a

basis for liability if the expenditure does not benefit the union. We find that theory troublesome, because it does not reflect the notion of interference with the rights of the owner which is the central characteristic of a theft crime. It is difficult to say that a theft occurs where A expressly permits B to take A's money and spend it, even if B's use of the money involves no benefit to A.

office, employment, or position of trust." The district court added that "to convert" means "to apply without authorization the moneys or properties of a labor organization to the temporary or permanent use, benefit, or profit of a person not legally entitled thereto." We find no reversible error in the district court's charge.

### III.

We turn to Stockton's contention that the district court erred in denying his motions for a judgment of acquittal. In reviewing the denial of a judgment of acquittal, we must determine whether there is no substantial evidence in the record to support the jury's finding that the defendant is guilty beyond a reasonable doubt. *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir.1982). In doing so, we must construe the evidence in the light most favorable to the prosecution. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Stroupe*, 538 F.2d 1063, 1066 (4th Cir.1976). We find that there is ample evidence to support Stockton's conviction.

First, the evidence strongly indicates that Stockton converted the union's funds to his own use. Bank records revealed that all of the checks charged in the indictment were deposited into one of Stockton's bank accounts, and that many of the deposits were quickly followed by payments to Stockton's creditors. Stockton's acts in depositing and spending the money clearly amounted to an exercise of control or dominion sufficient to constitute a conversion.

It is also clear that Stockton's appropriation of union funds was unauthorized and contrary to the wishes of the union. It is true that the testimony of Holding Company board members indicated that the board delegated decision-making authority concerning building maintenance to Stockton, and even suggested that the board might have approved Stockton's cleaning arrangements *had he told them honestly* that he himself, his wife, or his associates intended to perform the cleaning services.[10] Nevertheless, Stockton did not honestly seek the union's authorization for his arrangements. The union, acting through the Holding Company board, and altogether unaware of a close connection between M. Woods and Stockton, authorized the disbursement of funds to the M. Woods Janitorial Service, not to Stockton. By approving the payments to M. Woods, the union effectively denied permission to Stockton's appropriation of the same funds.[11]

The other elements of embezzlement were also present here. The union's funds were already in Stockton's lawful possession, in his capacity as union president, at the time the checks were drawn. In addition, the evidence indicates that Stockton exhibited the required mental state. He knew that his appropriation of union money was unauthorized, because it was flatly inconsistent with the union's authorization of payment to a different recipient, the M. Woods Janitorial Service, which the union believed to be in existence. Moreover, Stockton's deliberate misrepresentation of his activities indicates that he feared the union's disapproval had it known the truth.

Finally, Stockton emphasizes that the union received full value for its

---

**10.** For example, one Holding Company board member testified as follows:

Q. And it is fair to say that the Board as a whole didn't care who cleaned the Union Hall as long as it was cleaned.

A. Basically, that is true. As long as we were getting the work for the money being put out.

Q. You didn't care if Mr. Stockton did it himself, did you?

A. It never came to me that point, but I don't know. It shouldn't make any difference. The only thing I can say is as long as the work was done, if he chooses to do it or if you chose to do it or anybody that desired it. If the place wasn't cleaned up, it would be a different situation.

**11.** We are not here confronted with the perhaps less egregious case that would arise should a union official misappropriate funds silently, without expressly misrepresenting his activities to the union. Again, the question would appear to be whether the appropriation or expenditure of funds was within the scope of the trust placed in the official by the union.

money because the offices were in fact cleaned. It is true that the evidence showed that cleaning services were performed by someone, although there was testimony that the quality of the cleaning was not always satisfactory. Even assuming a high level of quality, however, Stockton has not made out a defense sufficient to overturn the verdict. Embezzlement is not excused by restitution of goods or services of equivalent value.[12] *Elmore v. United States,* 267 F.2d 595, 601 (4th Cir. 1959), *cert. denied,* 361 U.S. 832, 80 S.Ct. 82, 4 L.Ed.2d 74 (1959).[13] We conclude that the motion for a judgment of acquittal was properly denied.

### IV.

■■■■ Stockton's remaining claims of error are equally unpersuasive. He urges, first, that the district court committed reversible error in admitting those portions of the grand jury testimony of Sandra Simmons referring to threats made to her by Stockton's wife and associates.[14] Stockton urges that that testimony was inadmissible under Federal Rule of Evidence 403, which bars the use of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice."[15] We disagree. A district court must necessarily exercise a broad discretion under Rule 403, *United States v. Whitfield,* 715 F.2d 145, 147 (4th Cir.1983), and we cannot say that that discretion was abused here.

■■■■ The government offered Simmons' grand jury testimony for the purpose of impeaching her trial testimony, which tended to support the defense. The persuasiveness of the grand jury evidence for that purpose required the petit jury to conclude that threats had in fact been made to Simmons at the time of the grand jury proceedings, and to infer that, al-

---

**12.** Nor, we note in passing, is a tall tale such as Stockton told, not just to his union fellows, but also under oath to judge and jury, insulated from a prosecution for perjury for that reason. *See* 18 U.S.C. § 1621.

**13.** The prosecution need not even show that the victim of the embezzlement suffered an actual loss in the value of its property. *United States v. Barnes,* 761 F.2d 1026, 1032–35 (5th Cir.1985); *United States v. Bailey,* 734 F.2d 296, 304–05 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984).

**14.** Simmons' prior testimony before the grand jury would be hearsay, were it not for Fed.R. Evid. 801(d)(1)(A), which exempts from the definition of hearsay prior inconsistent statements made by a witness at trial, if those statements were made "under oath subject to the penalty of perjury at a trial, hearing, or other proceeding." Testimony before a grand jury falls within the scope of the rule. *United States v. Murphy,* 696 F.2d 282, 284 (4th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1303 (1983).

The fact that the grand jury testimony was used by the government to impeach its own witness is also no obstacle to its admission. Although at common law a party was barred from impeaching its own witness, the common-law rule has been superseded in federal court by Fed.R.Evid. 607, which provides that any party may impeach a witness.

**15.** Stockton also argues that Simmons' grand jury testimony was inadmissible under Rule 404(b), which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

Stockton contends that the government's real purpose in introducing the testimony was to link him with the threats made to Simmons, in an effort to show his bad character, and thereby to persuade the jury that he was capable of embezzlement. The government offered the evidence, however, for a genuine "other purpose," and the district judge emphasized that the jury was not to utilize the testimony in the manner of which Stockton complains. Although impeachment of a witness is not among the "other purposes" explicitly listed in Rule 404(b) by way of example, that list is not exhaustive, and impeachment qualifies as a permissible purpose for the introduction of other crimes. *Cf. United States v. Moreno,* 649 F.2d 309, 315 (5th Cir. 1981) (rehabilitation of witness constitutes acceptable "other purpose" under Rule 404(b)). Where a legitimate "other purpose" is shown, the district court must proceed to weigh the probative value and the potential prejudicial effect of the evidence under Rule 403. *United States v. Lewis,* 693 F.2d 189, 194 (D.C.Cir.1982); *United States v. Cook,* 538 F.2d 1000, 1003–04 (3d Cir.1976).

though Simmons had not been altogether intimidated at that time, she had been persuaded by subsequent threats, or the possibility of such threats, to recant at the trial. While the persuasiveness of the grand jury testimony for impeachment purposes required a somewhat indirect chain of reasoning, the inference of subsequent intimidation is not implausible, and the evidence had probative value. On the other hand, the potential prejudicial effect of the evidence was averted by the district court's careful limiting instruction. The distinction asked of the jury here—between the use of the grand jury testimony for impeachment and its use as evidence of Stockton's bad character—is not so subtle as to be "a feat beyond the compass of ordinary minds." *Shepard v. United States*, 290 U.S. 96, 104, 54 S.Ct. 22, 25, 78 L.Ed. 196 (1933). We conclude that Simmons' grand jury testimony was properly admissible.[16]

█ Finally, Stockton contends that the district court erred in denying his motion for a new trial based on newly discovered evidence that would impeach the entirety of the grand jury testimony of Sandra Simmons.[17] However, the argument is foreclosed by our decision in *United States v. Williams*, 415 F.2d 232 (4th Cir.1969). In that case, we held that new evidence going only to the credibility of a witness is not sufficient to justify the granting of a new trial. *Id.* at 233–34. While there may be exceptions to the general rule laid down in *Williams*, the present case is not one of them. *Williams* also teaches that, to justify a new trial, newly discovered evidence must be such as would probably produce acquittal. Plainly, that is not the situation here; Simmons' grand jury testimony, while important, was not indispensable to the government's case.

Accordingly, we affirm Stockton's conviction for embezzlement of union assets in violation of 29 U.S.C. § 501(c).

AFFIRMED.

**16.** Even were we to find that the district court abused its discretion in admitting the testimony, the error would not warrant reversal. An error is harmless when it is unlikely that the error could have affected the verdict reached by the jury in the particular circumstances of the trial. *United States v. Davis*, 657 F.2d 637, 640 (4th Cir.1981). Here, quite apart from Simmons' grand jury testimony, the evidence strongly supported Stockton's conviction, and it is altogether unlikely that, if there was error, it could have affected the verdict.

**17.** Portions of Simmons' grand jury testimony concerned disputed factual issues other than the threats allegedly made to her.