19 F.3d 12
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Burton DAVIS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ronald Eugene WALLER, Defendant-Appellant.
 Nos. 93-5172, 93-5199.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 10, 1993.
Decided March 16, 1994.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. Frank A. Kaufman, Senior District Judge. (CR-92-98-K)
 Denise Charlotte Barrett, Asst. Federal Public Defender, Baltimore, MD; Thanos Kanellakos, Baltimore, MD, for appellants.
 John Vincent Geise, Office of the U.S. Atty., Baltimore, MD, for appellee.
 James K. Bredar, Federal Public Defender, Baltimore, MD, for appellants.
 Lynn A. Battaglia, U.S. Atty., Debra A. Carr, Asst. U.S. Atty., Baltimore, MD, for appellee.
 D.Md.
 AFFIRMED.
 Before ERVIN, Chief Judge, WILKINS, Circuit Judge, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Both appellants were convicted by a jury of conspiracy to distribute and possess with intent to distribute cocaine base ("crack cocaine") in violation of 21 U.S.C. Sec. 846, and Ronald Waller ("Waller") was also convicted of possession with intent to distribute crack cocaine, in violation of 21 U.S.C. Sec. 841(a)(1).[1] On February 17, 1993, the district judge sentenced Waller to 188 months imprisonment with five years of supervised release and Burton Davis ("Davis") to 151 months imprisonment with five years of supervised release. Waller and Davis both appeal from their convictions and Waller is also appealing his sentence.
 
 
 2
 Collectively, appellants raise five issues: whether there was probable cause for the issuance of a search warrant, whether the district court erred in denying defendants' Batson motion, whether the district court committed reversible error in admitting hearsay statements of alleged co-conspirators, whether the conviction of Davis was supported by sufficient evidence, and whether the district court erred in calculating Waller's sentence. We find that none of the challenges raised by appellants warrants reversal and therefore we affirm both convictions and Waller's sentence.
 
 I.
 
 3
 The relevant facts for purposes of this appeal include the circumstances surrounding the execution of a search warrant on September 20, 1991 at the home of Willie Jean Turner ("Turner") and the conduct of, and evidence presented at, the trial on the merits which was held from November 23--December 4, 1992.
 
 
 4
 Waller lived in Vienna, Maryland and, in August of 1988, began dating Turner. According to Turner, Waller stayed at her house "five or six nights a week" in 1991. On September 20, 1991, police executed a search warrant at Turner's house. Turner was found to have marijuana stashed in her bra and pocketbook, and a radio scanner and $3,793 were found in the kitchen. The police found Waller hiding in Turner's bedroom closet. Along with Waller, the police found in the closet eighty-seven grams of crack cocaine wrapped in a brown paper bag, some marijuana, and $1,037.
 
 
 5
 Prior to trial, Waller sought to suppress the fruits of this search on the basis that the affidavit underlying the warrant contained false and misleading information and that, without this information, there was no probable cause to support the warrant. The affiant had been Corporal Vernon Murray, a member of the Maryland State Police assigned to the Dorchester County Narcotics Task Force. Waller based his assertions in part on evidence that another Task Force member, James Taylor, had resigned after being charged with theft of Task Force funds and making false statements with respect to a search warrant unrelated to Waller's case. Waller pointed out that Murray had been associated with Taylor and also proffered what he believed to be false or reckless statements in the body of Murray's affidavit.
 
 
 6
 Murray's affidavit asserted a variety of information pertaining to drug dealing by Waller, including: 1) a drug hotline had received approximately 15 calls in reference to Waller's drug activity at a residence described as Box 40A Church Street;[2] 2) a confidential informant, under the control of Murray and Deputy Tyrone Byris, had purchased crack cocaine from Waller at Turner's residence in April, 1991; 3) another confidential informant made another controlled purchase from Waller in June, 1991 at Turner's residence; 4) that information was received from the Seaford Police Department on September 6, 1991 that one of their informants purchased crack from Waller at a house in Vienna on three separate occasions; and 5) that Murray had received information from an informant during the weeks of September 1 and 17, 1991 about Waller's drug activity in Vienna.
 
 
 7
 The district court conducted a pre-Franks hearing,[3] see Franks v. Delaware, 438 U.S. 154 (1978), at which it heard testimony from Murray and others and considered the elements of the affidavit. The prosecution decided to forego reliance on certain parts of the affidavit, including the hotline calls, and the court found other aspects of the affidavit to be untrue and misleading, including an averment by Murray that the April, 1991 informant had been under constant surveillance during the purchase supposedly made from Waller. However, the court found that Murray had not made any intentional false statements. The court concluded that, even tossing out the misleading information, the affidavit set forth probable cause under Illinois v. Gates, 462 U.S. 213 (1983). Even if probable cause had not been found, stated the court, the good faith exception of United States v. Leon, 468 U.S. 897 (1984), would apply.
 
 
 8
 At the trial, the government offered the testimony of four witnesses: Turner, Deirdre Bolden, Thomas Thompson, and Thomas Trotter. Turner, who began cooperating with the government pursuant to a plea agreement in June, 1992, testified that two days before the search of her house, Waller met with Eric Batson in her house and eventually gave Batson money which was stored in a brown briefcase. The next day, Batson returned with a portfolio containing two cubes wrapped in gray masking tape and plastic and a duffle bag containing two pounds of marijuana. Batson and Waller then left the house and called for defendant Davis. Batson departed and Waller, Davis and his brother Lorenzo Davis walked down the road, Waller carrying the portfolio and Davis carrying the duffle bag. Turner further testified that Davis came back the next day and gave Waller a "plastic bag with crack cocaine in it and ... a plastic bag with powder in it and a plastic bag with marijuana."
 
 
 9
 Deirdre Bolden is a convicted felon who admitted to being a crack addict. She testified that she was present when a man named Mike Morris purchased crack cocaine from Waller in July, 1991 and also that Waller had given her crack on two separate occasions. She also testified that she received crack from Davis on two occasions, the second being on September 21, 1991, the day after the search of Turner's house and Waller's arrest. On this day, Bolden sent a woman named Delphine Fischer to purchase $10.00 of crack cocaine from Davis. Prior to this purchase, however, Bolden saw Davis speaking to a man who wanted to purchase "$200 to $300 worth of drugs." She did not see any transactions take place. Bolden was allowed to testify that, later that day, Waller's brother Larry told Bolden "Burton [Davis] never sell anything because he is too stingy on his weight" and also that "they needed to sell the stuff to get [ ] Waller out of jail." Bolden also overheard Davis, Lorenzo Davis and Larry Waller talking about raising money to send to Waller and a comment about Larry Waller wanting to "exchange some reefer for some crack."
 
 
 10
 Witness Thomas Thompson testified that he was a drug "runner" who ran drugs in exchange for crack. Thompson was a crack user who admitted to using as much crack as he could get. From 1986 until April 1988 and then again from January 1991 until September 1991, Thompson ran drugs from time to time for Waller, Davis, Lorenzo Davis, and Troy Perkins. When Thompson could not get drugs from Waller, he would go to Lorenzo or Burton Davis to get drugs that had come from Waller. Thompson testified that he had witnessed Perkins provide Waller with a couple of ounces of cocaine powder during one transaction in 1991. Thompson also testified about a meeting he observed between Batson and Waller at Turner's house, where Batson provided two kilograms of cocaine powder to Waller. Waller then "cooked up some" crack; when asked specifically how much of the cocaine was cooked into crack, Thompson said "a lot." Thompson indicated during his testimony that this transaction occurred in 1991, but later admitted that he could not really provide the date.
 
 
 11
 Thompson, like Turner, cooperated with the government in testifying against Waller and Davis, and had five felony charges and a theft charge put on a "stet docket" in Dorchester County. Thompson admitted that drugs at times made his memory hazy and that he experienced hallucinations two or three times a night when he was smoking crack.
 
 
 12
 The final witness was Thomas Trotter. Trotter himself dealt cocaine powder and methamphetamines, among other things. He was arrested in 1991 and found to have $20,000 and two ounces of heroin with him. He then entered a plea agreement with the government and agreed to testify against Waller. Trotter testified that during 1984-85 he sold small amounts of cocaine powder to Waller. During this time, Waller occasionally told Trotter that he was expecting a "shipment" from Batson. Then, in 1985, Trotter moved to Suffolk, Virginia. Between 1985 and 1990, Trotter's supplier for cocaine powder was a man named Frank Dickerson. Trotter testified, however, that once or twice he got small quantities from Waller for personal use. In 1991, Trotter began discussions with Batson and Batson told Trotter that he could provide cocaine powder to Trotter at a better price. Trotter testified that when Batson came to Virginia to discuss the cocaine sales, Trotter would ask him about Waller because Trotter trusted Waller and really did not know Batson that well. Trotter was allowed to testify that Batson "would say I just seen your boy and then he would say something like he just got a key, a couple keys." Trotter eventually purchased three kilos of cocaine powder from Batson and was about to purchase two more when he was arrested.
 
 II.
 
 13
 Waller and Davis collectively raise five issues on appeal. We will address each issue in turn.
 
 A. Validity of the Search Warrant
 
 14
 As noted above, Waller challenged the validity of the search warrant which was issued with respect to the September 20, 1991 search of Turner's house in Vienna, Maryland on the basis that the affidavit underlying the warrant contained false and misleading information and that, without this information, there was no probable cause to support the warrant. We review a magistrate's decision that there is probable cause to support the issuance of a search warrant by looking to see whether the magistrate had a "substantial basis for concluding that a search would uncover evidence of wrongdoing." Illinois v. Gates, 462 U.S. 213, 216 (1983) (citations omitted).
 
 
 15
 The district court, in denying Waller's motion to suppress the evidence which was seized from the house, thoroughly analyzed the contents of Corporal Murray's affidavit. The court found that some of the assertions in the affidavit were misleading and that other information was conclusory. Still, after excising the misleading information and considering the conclusory nature of other parts, the court found that the information "show[ed] so much drug activity at the location of the search and seizure during the period commencing April, 1991 and ending September, 1991, that there is little question in the mind of this Court that the standards of Gates and its progeny are met." Memorandum and Order of November 24, 1992. We adopt the district court's November 24, 1992 Memorandum and Order, to the extent that it addresses whether there was probable cause for the warrant, and we hold that the issuing magistrate had a "substantial basis for concluding that a search would uncover evidence of wrongdoing." Gates, 462 U.S. at 216. We do not need to address the district court's discussion of the Leon good faith exception.
 
 B. Defendants' Batson Challenge
 
 16
 Waller and Davis both challenge on appeal the district court's denial of defendants' Batson motion. See Batson v. Kentucky, 476 U.S. 79 (1986). The government utilized one of its peremptory challenges to strike a 20-year-old African-American female juror.[4] This juror did not list any employment on her juror information form and apparently neither the government nor the defense questioned her on this matter. The defense raised a Batson challenge and the government proffered that it had exercised the strike on the basis of the juror's age and apparent unemployment. The defendants argued that there were two white jurors who were unemployed and had not been stricken but these jurors were 58 and 49 years of age, respectively. After a hearing, the district court denied the Batson motion.
 
 
 17
 We review the lower court's denial of defendants' motion under the clearly erroneous standard. See, e.g., United States v. Grandison, 885 F.2d 143, 146 (4th Cir.1989), cert. denied, 495 U.S. 934 (1990). This Court has clearly set forth the analysis to be applied in the context of Batson challenges. See United States v. Joe, 928 F.2d 99 (4th Cir.1991). First, the defendant must establish a prima facie case by showing that he is a member of a cognizable racial group, that the prosecution used a peremptory strike to remove a juror who is in that racial group, and that the facts create an inference of intent by the government to discriminate. Id. at 102. If the defendant makes this showing, the prosecution must offer a race-neutral explanation for the strike. If the government does so, the defendant can still show purposeful discrimination by showing that the reason given is pretextual. On appeal, defendants argue that they met the first hurdle and the government failed to offer a race-neutral explanation. They again point to the two unemployed white jurors who were not stricken, and they also say that the government did not substantiate its assertion that the juror lacked the intellectual ability to serve on the jury in this case.
 
 
 18
 Case law supports the conclusion reached by the trial judge. In United States v. Ferguson, 935 F.2d 862 (7th Cir.1991), the government struck a young, unemployed, black juror and the court stated that "youth and unemployment have been held sufficiently race-neutral to support the government's use of peremptory challenges." Id. at 865. This Court in fact has upheld the use of peremptory strikes based on youth. See United States v. Mitchell, 886 F.2d 667, 671 (4th Cir.1989). Therefore, the trial judge's denial of defendants' Batson challenge was not clearly erroneous.
 
 
 19
 C. Hearsay Statements of Alleged Co-conspirators
 
 
 20
 Defendants' third contention is that the trial court improperly admitted, over defendants' objection, out-of-court statements made by alleged co-conspirators. Deirdre Bolden was allowed to testify that Larry Waller told her "Burton [Davis] never sell anything because he is too stingy on his weight" and also that "they needed to sell the stuff to get [ ] Waller out of jail." Thomas Trotter testified that Eric Batson, while referring to Waller, would say "I just seen your boy and then he would say something like he just got a key, a couple keys." After consideration of the record and the arguments, the Court finds this contention to be without merit.
 
 
 21
 D. Sufficiency of the Evidence with Respect to Davis
 
 
 22
 Davis asserts that the evidence was insufficient to convict him of the crack cocaine conspiracy count. He argues that"the testimony failed to establish a plausible link between [him] and the activities of [ ] Waller, and [ ] the not guilty verdicts returned by the jury were inconsistent with their finding of guilt on Count I."
 
 
 23
 The Court finds that this argument is also without merit. The standard of review on a sufficiency of the evidence argument is whether, construing the evidence in the light most favorable to the government, there is substantial evidence in the record to support a finding of guilt beyond a reasonable doubt. United States v. Stockton, 788 F.2d 210 (4th Cir.), cert. denied, 479 U.S. 840 (1986). The witness testimony outlined above, if believed by the jury, provided substantial evidence to support a finding of guilt on count I. Depending on what evidence the jury found to be credible, there is nothing inconsistent in the fact that Davis was convicted on count I and acquitted on counts II, IV, and V.
 
 E. Waller's Sentence
 
 24
 The final issue raised on appeal concerns the sentence imposed upon Waller. In calculating the quantity of drugs attributable to Waller for purposes of establishing the appropriate guideline sentencing range, the district court based his calculations in part upon the testimony of Thomas Thompson. As described above, Thompson testified that he observed Batson provide two kilograms of cocaine powder to Waller at Turner's house and that Waller then "cooked up some" crack; when asked specifically how much of the cocaine was cooked into crack, Thompson said "a lot." In determining how much of the cocaine powder was converted into crack, the court stated: "There was testimony that most of the Thompson powder went to crack. On that basis, that is at least fifty percent." From this finding, the court determined that the two kilograms of cocaine powder should be broken down into one kilogram of powder and 800 grams of crack.
 
 
 25
 Waller argues that the district court's finding was improper on the basis that Thompson's testimony lacked "sufficient indicia of reliability to support its probable accuracy." U.S.S.G.Sec. 6A1.3. Waller correctly points out that Thompson actually testified that "some" or "a lot" of the powder was "cooked into crack," as opposed to the "most" terminology used by the district court. Waller also notes Thompson's testimony about having hallucinations when he was smoking crack and having, at times, a hazy memory.
 
 
 26
 We review the trial judge's drug quantity determination under the clearly erroneous standard. United States v. Brooks, 957 F.2d 1138, 1148 (4th Cir.), cert. denied, 112 S.Ct. 3051 (1992). Here, despite the judge's use of the term "most," we cannot say that his finding that fifty percent of the powder was converted to crack is clearly erroneous. Therefore, we affirm the sentence imposed upon Waller.
 
 III.
 
 27
 We conclude that none of the challenges raised by defendants merit reversal. Therefore, both convictions and Waller's sentence are affirmed.
 
 
 28
 AFFIRMED.
 
 
 
 [1]
 Waller and Davis, along with Lorenzo Davis and Larry Waller were charged in a second superseding indictment dated October 28, 1992. The counts charged were as follows: 1) Waller, Davis, and Lorenzo Davis with conspiracy to distribute and possess with intent to distribute cocaine base from 1984 through September, 1991; 2) Waller, Davis, and Larry Waller with conspiracy to distribute and possess with intent to distribute marijuana from 1984 through September, 1991; 3) Waller with distribution of cocaine base on or about July, 1991; 4) Waller and Davis with possession with intent to distribute cocaine base on or about September 19, 1991; 5) Waller and Davis with possession of cocaine with the intent to manufacture cocaine base on or about September 19, 1991; and 6) Waller with possession with intent to distribute cocaine base on or about September 20, 1991
 Waller was convicted on counts one and six, Davis on count one, and they were acquitted on all other counts. The charge against Larry Waller was dismissed and Lorenzo Davis was acquitted.
 
 
 [2]
 The correct identification of Turner's house was disputed by Waller. The district judge, while finding that the dispute may have revealed a lack of precision on the part of Murray, concluded that there was no dispute about the property in question and that the exact label given to it was really immaterial
 
 
 [3]
 The court later adopted this hearing as a Franks hearing
 
 
 [4]
 All defendants in this case are African-American