**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 22-4239**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DANIEL CARRINGTON,

Defendant - Appellant.

**No. 22-4240**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DANIEL CARRINGTON,

Defendant - Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. John A. Gibney, Jr., Senior District Judge. (2:20-cr-00106-JAG-LRL-1)

Submitted: January 13, 2023                    Decided: February 14, 2023

Before NIEMEYER and QUATTLEBAUM, Circuit Judges, and MOTZ, Senior Circuit Judge.

───────────────

Affirmed by unpublished opinion. Judge Niemeyer wrote the opinion, in which Judge Quattlebaum and Judge Motz joined.

───────────────

**ON BRIEF:** Murdock Walker, II, Bingzi Hu, LOWTHER | WALKER LLC, Atlanta, Georgia, for Appellant. Jessica D. Aber, United States Attorney, Aidan Taft Grano-Mickelsen, Assistant United States Attorney, Richmond, Virginia, John F. Butler, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

───────────────

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

A jury sitting in Norfolk, Virginia, convicted Daniel Carrington on five counts, finding him guilty on one count of conspiracy to traffic in illegal drugs and on four counts of actual distribution on four different occasions, one resulting in death.

Several months after the jury's verdict, the government learned that one of its witnesses, a detective who had participated in the investigation, was accused of lying to superiors about reimbursement for gas he had purchased for his personal vehicle, and it disclosed the information to the court and Carrington. Based on this newly discovered evidence, Carrington filed a motion for a new trial. The district court denied the motion and then, during the same hearing, imposed a downward variant sentence of 540 months' imprisonment.

Carrington filed appeals from both his criminal judgment and the district court's order denying his motion for a new trial. In his appeal of the judgment, he contends that the evidence was insufficient to support the jury's verdict, and he challenges his sentence. As to his sentence, he argues that the district court erred in finding an offense level of 43 by applying U.S.S.G. § 2D1.1(a)(1), which provides for an offense level 43 if, among other things, his drug trafficking conviction was committed after he had one or more prior convictions "for a similar offense." He also argues that the court imposed a sentence "greater than necessary." And in his appeal of the order denying his motion for a new trial, he contends that the new evidence, discovered after the jury's verdict, demonstrated that an important witness at trial was "untruthful."

For the reasons that follow, we affirm.

3

I

Beginning in 2017, Carrington engaged in a conspiracy in the Tidewater area of Virginia to traffic in heroin, fentanyl, and acetyl fentanyl, which he obtained from a source in Baltimore, Maryland. During the course of his drug trafficking, he provided a mixture of fentanyl and acetyl fentanyl to a woman referred to as "D.J.," which resulted in her death on December 27, 2019.

Following an investigation of Carrington's conduct, which included several controlled purchases of illegal drugs from him, the government charged Carrington with one count of conspiracy to traffic in heroin, fentanyl, and acetyl fentanyl, in violation of 21 U.S.C. § 846; one count of distribution of fentanyl and acetyl fentanyl, resulting in death, in violation of § 841(a)(1) and § 841(b)(1)(C); and three counts of distribution on April 28, 2020; May 1, 2020; and May 7, 2020.

After a five day trial, a jury returned a verdict on May 21, 2021, finding not only that Carrington was guilty on all counts but also that he conspired to distribute and possess with intent to distribute one kilogram or more of heroin, 40 grams or more of fentanyl, and a detectable amount of acetyl fentanyl.

Several months after the jury returned its verdict — in September 2021 — the government learned that one of its witnesses — Chesapeake City Detective Omar Higazi, who participated in the investigation of the case — had been found to be untruthful with his superiors regarding his March 2021 request for gas reimbursement. The finding was made in August 2021 by the Chesapeake City Police Chief, who then fired Detective

Higazi. *During the trial* in this case, however, neither Detective Higazi nor the government's attorneys were aware of the administrative charge against Detective Higazi. When the government learned about it, it filed a notice, disclosing the information to the district court and to Carrington's counsel.

Based on the information in the government's notice, Carrington filed a motion for a new trial on December 29, 2021.

A month later, the government filed a supplemental notice, informing the court and Carrington's counsel that Detective Higazi's status had changed during the administrative appeal process and that the disciplinary action filed against Detective Higazi had been withdrawn, his employment record purged, and the determination made that Detective Higazi's firing was a voluntary resignation and he was eligible for rehire.

At a hearing on April 4, 2022, the district court denied Carrington's motion for a new trial and then proceeded to sentencing.

At sentencing, the district court found that Carrington's offense level was 43 and, with his criminal history Category IV, his advisory Guidelines sentence was life imprisonment. The offense level of 43 was derived from U.S.S.G. § 2D1.1(a)(1), which established a level 43 for drug distribution convictions when death results and the defendant had "one or more prior convictions for a similar offense." The court found that Carrington had a prior similar conviction. It then imposed a downward variant sentence of 540 months' imprisonment.

5

Carrington filed an appeal from the district court's judgment and a separate appeal from the district court's order denying his motion for a new trial. By order dated April 21, 2022, we consolidated the two appeals.

II

Carrington contends first that the evidence presented by the government was insufficient to convict him on Counts 2 through 5, which charged him with actual distributions of controlled substances on particular dates, and, in Count 2, with one such distribution resulting in death. He devotes most of his argument to his conviction on Count 2.

With respect to that count, he argues that the investigation was deficient because the police did not search all of D.J.'s house, but only the room in which she was found dead; that medical examiners concluded that D.J.'s death was caused by fentanyl and acetyl fentanyl "without a thorough autopsy"; that during the investigation a detective "admitted that he '[didn't] have probable cause to arrest'" Carrington; that while there was video footage of a black Chevrolet Malibu (Carrington's car) arriving at D.J.'s house, the footage did not disclose the identity of the driver or any drug transaction; that officers never recovered the cell phone that linked Carrington to the conversations he had with D.J.; that forensic examiners "only tested one out of nine capsules and one out of the three spoons located" in D.J.'s room; and that an associate and friend of Carrington, who testified on behalf of the government, lied as to some dates on which he said he had engaged in activities with Carrington.

6

Carrington's arguments do not, however, address the affirmative evidence that the government presented to support conviction. The fact that officers did not search D.J.'s house or test drugs and paraphernalia in the room was inconsequential. D.J. was not a criminal suspect, although she was acknowledged to have been a drug addict. The relevant fact to be established at trial was that D.J. was found dead shortly after receiving fentanyl from Carrington pursuant to an arrangement that they made by cell phone. To confirm the cause of death, the medical examiner conducted blood tests, which revealed that D.J. had overdosed on fentanyl and acetyl fentanyl, with the tests indicating that she had ingested five times what was considered to be a lethal dose. Moreover, Carrington provided no speculation as to what an autopsy might have shown that would have been relevant to his defense. As to the video camera footage, it showed that following numerous telephone calls between D.J. and Carrington, during which Carrington finally agreed to give D.J. a "dime" of drugs (meaning $10 worth), his car arrived at D.J.'s house. The footage shows that D.J. walked from her house to the car and then back into the house. A few hours later, her mother found her dead in her room. Moreover, a witness testified that Carrington later admitted that following a number of telephone calls that he had with D.J., he had finally sold her the "dime" of fentanyl that resulted in her death. In addition, from their investigation of D.J.'s room and purse, investigators recovered a folded piece of paper and a baggie that had traces of fentanyl, which witnesses linked to similar packaging obtained from Carrington during controlled purchases.

In short, there was ample evidence to support the jury's verdict on Count 2.

As to Counts 3 through 5, which arose out of controlled purchases of drugs from Carrington, Carrington argues that the evidence on those counts was insufficient because the circumstances of the controlled purchases, including the identity of Carrington, was undocumented by recordings or video, having only been testified to by the detective who organized, supervised, and observed the purchases. The detective reported in detail what he saw, implicating Carrington.

While video recordings or photographs surely would have been strong evidence of the transactions, the detective's testimony was clear and precise, providing all of the details of the transactions based on personal knowledge. Such evidence was both competent and sufficient to support convictions.

As the government noted, this case was tried over a period of 5 days, during which it presented 15 witnesses. The witnesses included individuals who testified to their personal participation in the conspiracy and individuals who relied on Carrington as a source of supply for controlled substances, as well as family members of the victim. Witness testimony also included the expertise of law enforcement officers, forensic scientists, a death investigator, an assistant chief medical examiner, a certified physician assistant, a narcotics expert, and a cellular tower expert. In addition, the jury was provided with over a hundred exhibits, which included recorded videos, phone calls, and messages. Indeed, in a recorded interview with law enforcement, Carrington admitted to being a drug dealer and having sold heroin since he was 16. The jury was also shown cell phone photos and videos, cell phone and text records, and social media accounts in which Carrington discussed and documented the drug trafficking conspiracy. Carrington's cell phone,

8

indeed, included videos taken by him that showed his residence, a firearm, bagged drugs, and a drawer full of thousands of dollars in cash. It also had the contact information for and communications with his Baltimore source of supply. Moreover, following the execution of a search warrant in Carrington's house, police recovered a scale and a sifter.

We conclude that Carrington's insufficiency of the evidence argument has no merit and therefore affirm his convictions.

### III

Carrington next challenges his sentence. He contends (1) that he did not qualify for an offense level 43 under U.S.S.G. § 2D1.1(a)(1) because none of his prior convictions qualified as "a similar offense," as required by the Guideline, and (2) that, in any event, his 540-month sentence was "greater than necessary" to achieve the sentencing goals of 18 U.S.C. § 3553(a).

Section 2D1.1(a)(1) specifies an offense level of 43 for a drug distribution offense when the use of the drug involved resulted in death and the offense was committed after one or more prior convictions "for a similar offense." In this case, Carrington had been convicted under state law in 2013 for possession with intent to distribute heroin, in violation of Va. Code. § 18.2-248. Carrington argues that his 2013 conviction was under a statute whose elements were broader than those for violation of 21 U.S.C. § 841 and that therefore, under the categorical approach, the 2013 conviction did not qualify as a "similar offense" under § 2D1.1(a)(1).

9

The difficulty with Carrington's argument is that § 2D1.1(a) gives no indication that it is to be interpreted under the categorical approach. To the contrary, that section provides that the prior conviction need only be *similar* to his current offense. His current offense involves the distribution of illegal drugs, including heroin, fentanyl, and acetyl fentanyl, while his earlier Virginia conviction involved the distribution of heroin, although the Virginia statute prohibited a broader scope of drugs than did the federal statute under which he was convicted here. Thus, while the Virginia offense might not be a precise match of the sort that would be recognized under the categorical approach, it is nonetheless "similar" to the federal statute. Both the Virginia statute and the federal statute prohibit the distribution of illegal drugs, and the drugs for which Carrington was convicted of distributing under the Virginia statute are also covered by the federal statute. We conclude that the Virginia conviction thus qualifies as a similar offense under § 2D1.1(a)(1). *See United States v. Johnson*, 706 F.3d 728, 731 (6th Cir. 2013) (holding that the term "similar offense" in § 2D1.1 is similar to the term "felony drug offense" as defined in the Controlled Substances Act); *United States v. Ward*, 972 F.3d 364, 369 (4th Cir. 2020) (holding that a violation of Virginia Code § 18.2-248 amounts to a "controlled substance offense" under the Sentencing Guidelines).

As to the substantive challenge to his 540-month sentence, the Guidelines advise that Carrington be sentenced to life imprisonment, which would have presumptively been a reasonable sentence. Taking into account Carrington's personal circumstances, however, the district court imposed a downward variance sentence of 540 months' (45 years') imprisonment. In light of all the § 3553(a) factors, which the district court addressed at

10

some length during sentencing, we conclude that the court did not abuse its discretion in selecting a 540-months sentence.

## IV

Finally, in his separate appeal, Carrington contends that the district court abused its discretion in denying his motion for a new trial based on information learned subsequent to the jury's verdict that an important witness, Detective Higazi, was accused of lying to his superiors when asking for a reimbursement for gas he purchased for his personal vehicle. Carrington contends that the new evidence "[d]emonstrated Detective Higazi's untruthfulness when working as law enforcement prior to and during the trial."

Relying on the five-factor standard articulated in *United States v. Custis*, 988 F.2d 1355 (4th Cir. 1993), for considering motions for new trials, the district court denied Carrington's motion. The court noted that the administrative claim and proceedings involving Detective Higazi's gas reimbursement had nothing to do with this case and therefore had no bearing on its merits. Therefore, the court concluded, the new evidence could only be used as impeachment evidence. Of course, as *Custis* points out, new impeachment evidence is merely one of the five factors, and it does not alone justify a new trial. *See Custis*, 988 F.2d at 1359; *see also United States v. Stockton*, 788 F.2d 210, 220 (4th Cir. 1986). While *Custis* does note an exception to the impeachment rule "[i]f the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases," 988 F.2d at 1359 (quoting *United States v.*

11

*Taglia*, 922 F.2d 413, 415 (7th Cir. 1991)), the district court in this case pointed out that the government's case did not rest solely on the testimony of Detective Higazi. To the contrary, the case rested on a broad range of evidence presented by numerous witnesses and much corroborating documentation. As the court noted:

> As to Counts One and Two, the overwhelming evidence against Carrington greatly dilutes the importance of [Detective Higazi's] testimony. For example, four cooperators who either directly participated in Carrington's drug trafficking conspiracy or purchased drugs from Carrington testified against him. Furthermore, at least six other law enforcement officials testified against Carrington, and the government presented dozens of exhibits and recordings to prove Carrington's guilt on these counts.
>
> Carrington similarly fails to show that the newly discovered evidence would probably lead to an acquittal of Counts Three through Five. The government presented numerous recordings of Carrington setting up, conducting, and discussing three controlled buys of fentanyl for which the jury convicted him. And despite Carrington's attempts to impeach the officer by asking him why he repeatedly used a deficient recording device during the three controlled buys, the jury still convicted Carrington of these counts. Thus, the newly discovered evidence will not probably lead to an acquittal at trial.

In these circumstances, we conclude that the district court did not abuse its discretion in denying Carrington's motion for a new trial.

\* \* \*

In sum, we affirm the judgment in appeal No. 22-4239 and the district court's order in appeal No. 22-4240.

AFFIRMED

12