**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AUGUSTINE POUNDS, Doctor,
<u>Plaintiff-Appellant,</u>

v.

No. 98-2755

BOARD OF TRUSTEES, ANNE ARUNDEL
COMMUNITY COLLEGE; MARTHA
SMITH, Doctor,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Paul W. Grimm, Magistrate Judge.
(CA-96-3977-CCB)

Argued: April 6, 2000

Decided: May 12, 2000

Before WIDENER, TRAXLER, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Andrew Radding, Russell Gable Alion, Jr., ADELBERG,
RUDOW, DORF, HENDLER & SAMETH, L.L.C., Baltimore, Mary-
land, for Appellant. Russell Heuer Gardner, PIPER & MARBURY,
L.L.P., Baltimore, Maryland, for Appellees. **ON BRIEF:** Andrea S.
Baker, ADELBERG, RUDOW, DORF, HENDLER & SAMETH,
L.L.C., Baltimore, Maryland, for Appellant. Tracey G. Turner, Larry

R. Seegull, Paul A. Mallos, PIPER & MARBURY, L.L.P., Baltimore, Maryland; Martin J. Snider, Annapolis, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Dr. Augustine Pounds sued the Board of Trustees (the"Board") of Anne Arundel Community College ("AACC") and Dr. Martha Smith, its President, in the District of Maryland, alleging that her employment as Vice President and Dean of AACC was not renewed on account of her race.[1] After hearing the evidence, a jury found Dr. Pounds "qualified for her job at the time of the adverse employment action," but not "performing her job at a satisfactory level" when she was terminated. In accordance with the jury's verdict, the district court[2] entered judgment in favor of the Board and Dr. Smith.

Dr. Pounds has appealed to this court, asserting that the district court erroneously admitted certain evidence against her at trial. As explained herein, we find no reversible error and affirm the court below.

_____

[1] Specifically, Dr. Pounds's claims at trial consisted of racial discrimination in violation of: (1) Title VII, 42 U.S.C.§ 2000e et seq., by the Board and by Dr. Smith in her official capacity; (2) 42 U.S.C. § 1981, by Dr. Smith in her individual capacity; (3) 42 U.S.C. § 1983, by Dr. Smith in her individual capacity; and (4) Article 24 of the Maryland Declaration of Rights, by the Board and by Dr. Smith.

[2] By consent, this suit was tried by the United States Magistrate Judge in Baltimore. See 28 U.S.C. § 636(c)(1).

I.

A.

At trial, it developed that in 1991, Dr. Thomas E. Florestano, Sr., the President of AACC at the time, hired Dr. Pounds as Vice President and Dean for Student Services, College Development, and Intercollegiate Athletics. He subsequently gave her excellent evaluations for the work she performed at AACC. In the summer of 1994, Dr. Florestano retired and Dr. Smith became AACC's President. Dr. Pounds is an African-American woman; Dr. Smith is a Caucasian woman.

A most significant event in this case occurred during the summer of 1994. Dr. Pounds, not pleased with the performance of the AACC Director of Admissions, Herb Curkin, sent him a disapproving memorandum about excessive absenteeism, forwarding a copy to Dr. Smith. Mr. Curkin then met with Dr. Smith, advising her that he had been absent from work because he was under medical care for extreme stress arising from Dr. Pounds's frequent harassment, which he perceived as humiliating and demeaning. Dr. Pounds recommended to Dr. Smith that Mr. Curkin be terminated or demoted, and assured her that there would be little (if any) negative reaction from the other staff members. Dr. Smith offered Mr. Curkin a choice between termination and completing his contract under another supervisor. Mr. Curkin preferred termination, and his employment at AACC was terminated in early Fall 1994.

Contrary to Dr. Pounds's prediction, there was an immediate and strong negative reaction by Mr. Curkin's staff to the news of his termination. Many of the staff members attributed his termination to Dr. Pounds, and Dr. Smith was surprised by the strong feelings generated by the termination. Dr. Pounds, for her part, believed that Dr. Smith failed to openly and adequately accept responsibility for Mr. Curkin's termination. Dr. Smith told Walter Hall, a member of the Board, that she questioned whether the termination was the correct decision, and that she doubted whether Dr. Pounds was the right person for the Vice President position.

On October 3, 1994, Dr. Smith met with Dr. Pounds and advised her that, during a meeting with Mr. Curkin's staff, the staff had criti-

cized Dr. Pounds. Dr. Smith also advised Dr. Pounds that she should find another profession, because she was not qualified to work at AACC. Four days later, on October 7, 1994, Dr. Smith sent a follow-up memorandum to Dr. Pounds concerning their October 3 meeting. In the memorandum, Dr. Smith suggested a staff retreat be conducted to attempt to resolve some of Dr. Pounds's problems, and Dr. Smith offered to have AACC fund the retreat. Shortly afterward, in a meeting between Dr. Smith, Dr. Pounds, and Donald Roane (a Board member), Dr. Smith agreed to destroy the October 7 memorandum, and she did so. In addition, on approximately October 12, 1994, AACC hired Dr. Eleanor Hooks, a human relations consultant suggested and contacted by Dr. Pounds, to assess the Student Services Division's environment and to conduct the staff retreat.

B.

The consultant, Dr. Hooks, investigated the various problems by conducting two meetings with the staff, and by collecting confidential survey responses to assess the staff's opinions on their morale and leadership. These surveys, in order to preserve confidentiality, were supposed to be returned by mail to Dr. Hooks, but some responses were apparently received at Dr. Smith's office. [3]

On October 25, 1994, Dr. Hooks issued a report that, in substance, advised AACC of three points: (1) Dr. Pounds's staff was very anxious due to Mr. Curkin's termination; (2) her staff mistrusted AACC's leadership (specifically, Dr. Smith); and (3) the staff -- the majority of whom were Caucasian -- felt that Dr. Pounds' hiring pattern was racist because African-Americans were frequently hired.

_____

[3] The record reflects that Dr. Smith's office received nineteen responses to Dr. Hooks's survey. These responses were all typed; only four were stamped with the President's seal, the normal method for processing incoming mail. These nineteen responses contained more extensive criticism of Dr. Pounds than the other survey responses. Most of the survey responses that Dr. Hooks received directly were handwritten.

4

C.

The evidence reflects other incidents during the relevant time period that emphasize the ongoing conflict between Dr. Smith and Dr. Pounds, including the following:

On October 25, 1994, Dr. Sylvia Ingram, Assistant to the President for Diversity and Federal Compliance, addressed the President's Council about the campus process for dealing with racial tensions. The members of the President's Council consisted of President Smith, the AACC Vice Presidents, and other high level administrators. On November 7, 1994, Dr. Pounds submitted a memorandum entitled "Request for a New Commitment" to the President's Council and to Dr. Ingram, asking that the college address racial tension on campus. On November 15, 1994, Dr. Ingram responded, advising that, based on Dr. Pounds's complaint, she was initiating an investigation. Dr. Smith asked Dr. Pounds to write a correcting letter to negate the treatment of Dr. Pounds's memorandum as a complaint, to prevent opening AACC to liability. According to Dr. Pounds, she did so against her own desires.

Also, AACC hired Mr. Leonard Mancini to replace Mr. Curkin; he was the only applicant interviewed. Mr. Mancini was a Caucasian male who had worked for Dr. Smith at her prior employment. He did not possess a doctorate degree, unlike other applicants for Mr. Curkin's position. After Dr. Pounds was terminated, Mr. Mancini was promoted and assumed Dr. Pounds's duties.

D.

AACC was required to give Dr. Pounds ninety days notice that her employment contract would not be renewed. As of March 1995, Dr. Smith could not support a non-renewal of Dr. Pounds's contract for the contract year beginning in July 1995. In June 1995, Dr. Smith drafted her first evaluation of Dr. Pounds, which was extremely critical of Dr. Pounds's performance. Dr. Smith then met with Dr. Pounds and suggested that she resign rather than allow the evaluation to be placed in her employment record.**4**

_____

**4** At trial, Dr. Pounds testified that in the June 1995 meeting, Dr. Smith angrily screamed at her, "I could get rid of you, and there is no way that

5

In September 1995, Dr. Smith advised Dr. Pounds that her contract would not be renewed in 1996. On October 23, 1995, Dr. Smith's evaluation of Dr. Pounds was finalized; in almost every category, the lowest rating was assigned.

In October 1995, Mr. Mancini requested that the college's Human Resources Department intervene in a conflict between him and Dr. Pounds. In support of his request, he attached a copy of a memorandum he had written to Dr. Pounds about her conduct in a September 1995 meeting to evaluate his performance as Dean of Enrollment. Mr. Mancini's memorandum stated that Dr. Pounds informed him that she had contacted several of his co-workers at his previous job at another college. According to Dr. Pounds, these co-workers informed her that a sexual harassment complaint had been filed against Mr. Mancini at that college. Dr. Pounds also accused Mr. Mancini of undermining her authority at AACC through discussions, outside her presence, with higher administrators. Mr. Mancini's memorandum emphatically denied these accusations, demanded that she cease communicating such falsehoods about him to others, and indicated that, should she continue such destructive conduct, he would seek legal advice on how to protect his reputation. The Director of Human Relations forwarded a copy of Mr. Mancini's memorandum to Dr. Smith.

In November 1995, a senior faculty member, Professor Leon Sagan, asked to meet with Dr. Smith. In that meeting, he informed Dr. Smith that, according to Dr. Pounds, she professed not wanting to fight Dr. Smith or the institution, but she would "defend herself appropriately if she were maligned." Professor Sagan memorialized his conversation with Dr. Pounds in writing, and provided a copy to Dr. Smith. Based on his conversation with Dr. Pounds, Professor Sagan wrote that he felt it necessary to warn Dr. Smith to have a third party present during any discussions with Dr. Pounds.

_____

you will be able to say that it was related to your race. I know how to get rid of you, and you will never be able to claim that it was related to race." This assertion is not mentioned in her EEOC complaint or the complaint filed in the district court, nor did she mention it during her deposition or in other discovery.

Dr. Smith then met with two Board members, Walter Hall and Dr. Donald Roane, and with legal counsel. She informed them of the incidents relating to Mr. Mancini and Professor Sagan, and expressed her concern that Dr. Pounds's conduct exposed AACC to serious risk of legal liability. The Board members and Dr. Smith agreed that Dr. Pounds's termination should be considered.

At the Board's December 12, 1995 closed meeting, Dr. Smith, on the advice of Mr. Hall and Dr. Roane, informed the full Board of the incidents relating to Mr. Mancini and Professor Sagan, and she also informed them of her intention to terminate Dr. Pounds. The Board endorsed her decision. At that meeting, Dr. Roane informed the Board of a third incident relating to Dr. Pounds. He reported information received from Carl Snowden, a prominent civic leader and activist in the Annapolis area, who was a part-time AACC faculty member. Mr. Snowden said that he had been approached by Dr. Pounds with a request for his support, and that she stated that she would make it difficult for him at the college if he failed to support her. After hearing about this third incident, the Board concluded that the situation was "extremely serious" for AACC, questioned whether Dr. Pounds should be around the campus, and advised Dr. Smith to "take some quick action and to stop what was going on."

On December 13, 1995, Dr. Pounds was terminated and requested to leave the AACC campus. The college paid Dr. Pounds's salary and benefits through the remaining term of her 1995-96 contract year.

Dr. Pounds then filed this lawsuit, alleging that the failure to renew her employment with AACC was due to racial discrimination by the Board and Dr. Smith. After discovery and an eight day trial[5] in October 1998, the jury concluded that, although Dr. Pounds "was qualified for [the Vice President's position at AACC]," she was not "performing her job at a satisfactory level." J.A. 1601. The district court entered judgment for the defendants on the jury verdict, and Dr. Pounds has appealed.

_____

**5** During the trial, the plaintiff presented testimony from eight witnesses and the defendants presented testimony from ten witnesses. In addition, voluminous exhibits were presented in evidence before the jury.

II.

Dr. Pounds seeks reversal on the basis that the district court erroneously admitted two types of evidence against her. First, she asserts as error the district court's decision to admit, for impeachment purposes, evidence of her prior complaints of racial discrimination at two universities where she had previously been employed. Second, Dr. Pounds alleges that the district court erroneously admitted hearsay evidence in certain respects, including the survey conducted by Dr. Hooks. We review the district court's evidentiary rulings for abuse of discretion. See Benedi v. McNeil-P.P.C., Inc. , 66 F.3d 1378, 1382 (4th Cir. 1995).

A.

Dr. Pounds contends that the district court improperly permitted "propensity" character evidence to come before the jury, when it admitted, as impeachment, evidence of her claims of racial discrimination against her two previous employers.[6] She asserts that Rules 404(b) and 403 prohibit the admission of such evidence. See Fed. R. Evid. 404(b) (evidence of other acts "not admissible to prove the character of a person to show action in conformity therewith"); 403 (discretionary exclusion of unfairly prejudicial or confusing evidence). During cross-examination of Dr. Pounds, she was questioned about a letter she had written in 1987 to her former supervisor at Iowa State University, Professor Thomas Thielen, asserting he was "guilty of insensitivity, racism, and sexism." The court first admitted "the portion of the letter that deals with the accusation of racism and sexism," then admitted the letter in its entirety. [7] In addition to permitting

_____

[6] Dr. Pounds also contends that this evidence was improperly referred to during the defendants' opening statement and closing argument. However, Dr. Pounds did not properly preserve either of these contentions by contemporaneous objection. Having reviewed the plaintiff's contentions on those remarks for plain error, as we must, we conclude that they are not plainly erroneous.

[7] Plaintiff's counsel agreed to the admission of the entire document, subject to her objection to the above-described portion. The cross-examination related to the following excerpts from Dr. Pounds's March 26, 1987 letter to Prof. Thielen:

8

cross-examination of Dr. Pounds about her complaints to Professor Thielen concerning his alleged racism, the court also allowed cross-examination of Dr. Pounds with respect to a lawsuit she filed against Iowa State University in 1989 that alleged racially based salary inequities, as well as her complaints of racial discrimination when she worked at Murray State University in Kentucky in 1989 and 1990.[8]

_____

> This letter is in response to your evaluation of my performance as Dean of Students on October 23, 1986.
>
> . . . .
>
> 3. INSENSITIVITY, RACISM AND SEXISM
>
> I have typed exact comments from the evaluation and attached a letter from you that I view as insensitive and have [sic] tones of racism and sexism throughout. Other comments are made throughout this document that support my perception of problems of racism and sexism.

[8] On cross-examination, defense counsel questioned Dr. Pounds concerning what had transpired at Iowa State and Murray State:

> Q: Dr. Pounds, isn't it also true that you filed a complaint alleging salary inequity based on race at Iowa State?
>
> A: No.
>
> . . . .
>
> Q: And, Dr. Pounds, isn't it true that after you left Iowa State, you accused them of having treated you differently in terms of salary based on race?
>
> . . . .
>
> A: That is not true, Ms. Lamdin.
>
> . . . .
>
> Q: . . . [M]y question was whether Dr. Pounds personally claimed race discrimination at Murray State University [against Dr. Pounds].
>
> . . . .
>
> A: I did not. . . . Let me think.
>
> . . . .

9

1.

Rule 404(b) generally bars the use of character evidence as substantive proof of conduct in conformity thereof. Fed. R. Evid. 404(b). However, evidence used for impeachment purposes is not admitted as substantive proof, and evidence that establishes a witness's bias or motive may properly be utilized for impeachment purposes. Bias is an "[i]nclination; bent; . . . a preconceived opinion; a predisposition to decide a cause or an issue in a certain way." Black's Law Dictionary 162 (6th ed. 1990). Evidence of a witness's bias or motive is thus nearly always relevant. See United States v. Abel, 469 U.S. 45, 56 (1984) (noting that evidence showing a witness's potential bias is relevant and admissible); see also Fed. R. Evid. 607 (allowing any party to attack the credibility of a witness); 401 (defining relevant evidence).

And because the challenged evidence was proper impeachment material, its use may be governed either by Rule 608 or by Rule 404(b). See Fed. R. Evid. 608 (evidence of character and conduct of witness); United States v. Stockton, 788 F.2d 210, 219 n.15 (4th Cir. 1986). Dr. Pounds argues that application of the Hernandez test for the admissibility (as substantive proof) of evidence of a witness's prior bad acts requires the conclusion that the district court erred. See United States v. Hernandez, 975 F.2d 1035, 1039 (4th Cir. 1992) (Rule 404(b) permits admission of prior acts evidence that is relevant to an issue other than character, necessary, and reliable).

_____

Q: So, your answer is that you did claim that Murray State University discriminated against you on the basis of your race?

A: Yes.

Q: Dr. Pounds, let's go back to Iowa State University for just a moment . . . . Having now looked at this document, Pounds v. ISU, February 15, 1989, does this refresh your recollection of having filed a complaint of salary inequity based on race at Iowa State University?

A: It does not. I would have to see the complaint that I filed.

J.A. 856-61.

10

To the extent that the complained-of evidence was admitted pursuant to Rule 404(b), impeachment was an entirely proper basis for such admission. See Stockton, 788 F.2d at 219 n.15. For example, Dr. Pounds's letter to Professor Thielen was properly admissible under Rule 404(b), in that it was relevant to demonstrate her bias or motive. While Dr. Pounds understandably contests the evidence's relevance under Hernandez, we must reject this assertion in light of the fact that a witness's bias affects the weight of her testimony. Importantly, Dr. Pounds fails to specifically dispute this evidence's necessity or reliability to prove witness bias or motive, and we see no abuse of discretion in the admission and use of such evidence. Indeed, particular instances of conduct may be inquired into on cross-examination of the principal witness. Fed. R. Evid. 608(b)(2) advisory committee's note. Under the circumstances, the impeachment of Dr. Pounds by these prior instances of claimed racism was a proper discretionary issue for determination by the trial judge.

2.

Dr. Pounds advances three other arguments in support of her position that use of the impeachment evidence was improper pursuant to Rule 404(b). First, she argues that the purported purpose for admitting this evidence, impeachment based on her bias or motive, was pretextual. Second, she asserts that the manner in which the evidence was used, and the court's failure to provide the jury with a limiting instruction on its consideration and weight, converted its impeachment purpose into substantive proof of her character as a person with a propensity to be litigious. Third, she simply contends that use of the evidence was unfairly prejudicial.

In support of her first contention, that the evidence was admitted based on the pretext that it was offered for impeachment on bias or motive, Dr. Pounds relies on our decision in Sparks v. Gilley Trucking Co., Inc., 992 F.2d 50 (4th Cir. 1993), an automobile accident negligence case. In Sparks, we concluded that Rule 404(b) prohibited admission of the plaintiff's prior speeding tickets, and that the court erred in admitting such evidence to show intent to speed on the day in question. See Sparks, 992 F.2d at 51-52. We reasoned that proof of a party's specific intent is not required to prove negligence, and speeding tickets are issued without regard to an individual's intent. Id.

11

Therefore, the district court's admission of speeding tickets was prejudicial error on the facts of that case. Id. However, Sparks is entirely silent on the issue of pretext, and does not assist Dr. Pounds here, where a legitimate purpose for use of the evidence was offered and accepted by the trial court: impeachment of Dr. Pounds's credibility as a primary witness in this case.

Next, Dr. Pounds argues that the sole purpose of the impeachment of her testimony was to prove her character as a person with a propensity to be litigious.[9] First, as we have explained above, the evidence was properly admitted for impeachment purposes. Dr. Pounds asserts that evidence of past racial discrimination allegations was not simply impeaching, but was offered to prove that she was litigious. This attempt to recast the use of the evidence is unavailing; its use directly related to her credibility. It demonstrated that, in employment settings, she had previously attributed others' conduct to racial discrimination, and that she had arguably testified to the contrary before the jury in this case.

Finally, Dr. Pounds asserts that unfair prejudice to her interests outweighs any legitimate probative purpose of this evidence. We consider the potential for unfair prejudicial effect in light of other evidence heard by the jury. Having done so, we are unable to find unfair prejudice in the cross-examination and impeachment of Dr. Pounds. Indeed, the first witness at trial, Dr. Florestano (called by Dr. Pounds) described two instances in which Dr. Pounds accused other college employees of being racists. J.A. 464-66. Further, Dr. Pounds stated no grounds for objection when another college employee testified that Dr. Pounds called her a racist. J.A. 1270-73. Given this evi-

_____

[9] Dr. Pounds also argues that she was prejudiced because the district court did not give a limiting instruction relating to the assertions of her past allegations of racial discrimination. "To protect against the danger of prejudice the court should give a limiting instruction under Rule 105 if one is requested." Sparks, 992 F.2d at 52 (emphasis added); see also Fed. R. Evid. 105 ("the court, upon request , shall restrict the evidence to its proper scope and instruct the jury accordingly") (emphasis added). Dr. Pounds made no request for a limiting instruction, and we decline to conclude that the court's failure to provide one sua sponte unfairly affected the outcome of this trial.

12

dence of Dr. Pounds's prior racial allegations directed at college employees, her claim on appeal of a separate and distinct harmful impact from the impeachment of her testimony in the manner permitted is substantially weakened.

It is also significant that Dr. Pounds opened the door to cross-examination on the issue of her views of racial impact on her relationships in her prior employment experiences. In her direct testimony, she described that she had an "excellent relationship" with John Dalton, her white supervisor at Iowa State for ten years. She then described her relationship with her next supervisor at Iowa State, Dr. Thielen, as "excellent" and "a very good relationship." Then, in response to her counsel's inquiry, "did you encounter racial problems at Murray State University?" she responded, "We did."

Put simply, Dr. Pounds placed at issue her perceptions of racial issues relating to employment issues. And the evidence established other instances in which Dr. Pounds accused AACC college employees of racist conduct. In these circumstances, we cannot conclude that she was unfairly prejudiced by the use for impeachment purposes of the evidence of which she complains, and we conclude that the district court properly exercised its discretion by permitting its use before the jury.

B.

Dr. Pounds also alleges that the district court erroneously admitted other prejudicial and inadmissible hearsay evidence against her. She identifies several such items, which we briefly summarize here. First, in her testimony, Dr. Smith read directly from anonymous survey responses that were received in her office. Dr. Smith also testified that she had heard that Dr. Pounds's staff was demoralized and that the college's constituent group representatives told Dr. Smith that "many, many members of their constituent groups were very, very dismayed by the decision [to terminate Mr. Curkin]." Dr. Smith, in explaining her decision to remove Dr. Pounds from the Board of Directors of an AACC fund-raising organization, described a common theme in negative reports to her from others involved in that organization. Finally, Mr. Hall testified that, at the December 12, 1995 Board meeting, Dr.

13

Roane informed the Board of the incident between Dr. Pounds and Mr. Snowden.

Dr. Pounds contends that these were instances of inadmissible hearsay evidence being placed before the jury, and that they lacked the indicia of trustworthiness required for an exception to the general rule of hearsay inadmissibility. She also argues that the defendants pretextually offered hearsay to prove their states of mind, when in fact it was used for its substantive truth. She also asserts that, notwithstanding the admissibility of these instances of hearsay, the district court erred because the probative value of the evidence was, in each instance, substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403.

Put simply, the instances of complained-of evidence was properly presented and admissible to establish the bases underlying the defendants' decisions to terminate Dr. Pounds's employment. A statement that is offered to prove state of mind is not hearsay. See Fed. R. Evid. 801(c) (limiting the definition of hearsay to statements offered to prove the truth of the matter asserted); see also Haddad v. Lockheed California Corp., 720 F.2d 1454, 1456 (9th Cir. 1983) (noting that management's testimony regarding third parties' complaints about working with the plaintiff was not hearsay because it was offered to demonstrate the employer's non-discriminatory intent and not to prove the truth of the complaints); Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1249 (6th Cir. 1995) (deciding that racist comments were not hearsay because they were offered to demonstrate racial attitudes and were not offered to prove the truth of the comments).

Because the defendants contend that their employment actions were based on entirely legitimate reasons, rather than on Dr. Pounds's race, these decision-makers' states of mind when these decisions were made were critical to the defense. The district court repeatedly and properly instructed the jury that the evidence was to be considered only for its proof of the decision-makers' states of mind at the relevant time. Importantly, Dr. Pounds was permitted to introduce related evidence attempting to establish that some of this evidence was unreliable as to substantive truth. Again, we are unable to conclude that

14

the district court abused its discretion by admitting this evidence, and we find no reversible error in this regard.

III.

Pursuant to the foregoing, we find no abuse of discretion with respect to the challenged evidence in this case. We therefore affirm the judgment of the district court.

AFFIRMED

15